TRI–STATE GENERATION AND TRANSMISSION ASSOCIATION, INC., a Colorado corporation, Plaintiff-Appellant,

v.

SHOSHONE RIVER POWER, INC., a Wyoming corporation; H. David Brannon, a Wyoming resident; Alan Siggins, a Wyoming resident; Martin Nielsen, a Wyoming resident; John S. Bereman, a Wyoming resident; and Rick Wogoman, a Wyoming resident, acting in their official capacity as directors of Shoshone River Power, Inc.; and Pacificorp, a Maine corporation, doing business as Pacific Power & Light Company, Defendants-Appellees,

United States of America on Behalf of Rural Electrification Administration, National Rural Electric Cooperative Association and National Rural Utilities Cooperative Finance Corporation, Amici Curiae.

No. 86–1413.

United States Court of Appeals, Tenth Circuit.

Nov. 13, 1986.

Michael A. Williams, of Sherman & Howard, Denver, Colo. (Robert E. Youle and Edward A. Gleason, of Sherman & Howard, and James L. Applegate of Hirst & Applegate, P.C., Cheyenne, Wyo., with him on briefs), for plaintiff-appellant.

Stephen S. Walters, of Stoel, Rives, Boley, Fraser & Wyse, Portland, Or. (Roy Pulvers, of Stoel, Rives, Boley, Fraser & Wyse and Stanley K. Hathaway, of Hathaway, Speight and Kunz, Cheyenne, Wyo., with him on briefs), for defendants-appellees.

Diane Ennist, Civil Div., Dept. of Justice, Washington, D.C. (Richard K. Willard, Asst. Atty. Gen. and J. Christopher Kohn, Civil Div., Dept. of Justice, Wallace F. Tillman and Michael D. Oldak, National Rural Elec. Co-op Ass'n, John List, National Rural Utilities Co-op Finance Corp. and Richard M. Sharp, of Shea & Gardner, Washington, D.C., on brief), for amici curiae.

Before McKAY, SEYMOUR and BALDOCK, Circuit Judges.

McKAY, Circuit Judge.

Tri-State Generation and Transmission Association, Inc. (Tri-State) asks this court to determine whether the trial court erred in dissolving a preliminary injunction that enjoined completion of the sale of Shoshone River Power, Inc.'s (Shoshone) assets to Pacific Power & Light Company (Pacific). The issue before this court is whether the trial court abused its discretion in failing to enjoin the sale of Shoshone's assets pending the outcome of the trial on the merits.

I.

In 1936, Congress enacted legislation that set in motion a program to meet a perceived need for supplying electric power to rural America. The Rural Electrification Act of 1936, ch. 432, 49 Stat. 1363 (codified as amended at 7 U.S.C. §§ 901–950b (1980 & Supp.1986)), created the Rural Electrification Administration (REA) and made provisions for loans that would enable rural communities to obtain electric power. Acting in response to the legislation and in order to take advantage of the opportunities provided by creation of the REA, rural communities across America

formed electrical distribution cooperatives. In 1942, individuals from Park County, Wyoming, organized one such cooperative, Shoshone, as a not-for-profit corporation under the laws of the State of Wyoming. Although Shoshone's bylaws allow it to provide electric power to consumers who are not members of Shoshone, apparently all consumers of electric power who live within the geographic area served by Shoshone are members of the cooperative.

After distribution cooperatives such as Shoshone were formed, groups of such cooperatives, in an effort to more economically provide power to their member consumers, joined together to form central generation and transmission cooperatives such as Tri-State. The distribution cooperatives that banded together to form Tri-State were organized under the laws of three states: Colorado, Nebraska and Wyoming. Tri-State itself was organized as a not-for-profit corporation under the laws of Colorado. Tri-State's primary purpose is to supply electric power to its member distribution cooperatives. These member cooperatives, in turn, are simply vehicles for delivering power to their own members. In order to accomplish these very expensive objectives, the REA, under its statutory authority, periodically provides or guarantees loans to both distribution cooperatives and generation and transmission cooperatives. Tri-State has received many such loans.[1]

While authorizing the REA to make loans to carry out the purposes of the Rural Electrification Act, Congress cautioned that loans should not be made unless the REA first determined that "the security therefore is reasonably adequate." 7 U.S.C. § 904 (1982). In order to effectuate that mandate, the REA, before granting loans to generation cooperatives such as Tri-State, requires all the member distribution cooperatives to enter into full requirements contracts with the generation coop-

erative. *See* Government Amici Brief at 7. The REA imposes such an arrangement on Tri-State and its distribution cooperatives; all Tri-State's distribution cooperatives are required to contract to fulfill all their energy requirements through Tri-State before the REA makes or guarantees loans to Tri-State. Record, vol. 2, at 36–37, 112–14. Furthermore, the term of each requirements contract must match that of the payment period of Tri-State's loans. Each time the REA extends or guarantees a loan to Tri-State, it requires each member distribution cooperative to commensurately extend its requirements contract term so as to cover the same period as the loan. In essence, the requirements contracts guarantee a complete payback of the loans.

Using funds from REA loans or REA-guaranteed loans, Tri-State makes the capital outlays necessary to develop the generation and transmission capacity which will satisfy the present and future electric power requirements of the distribution cooperatives. The record in this case reflects that, after Tri-State's most recent capital expenditures, market circumstances made it possible for Pacific to satisfy, over existing power lines, the electrical needs of consumers who currently purchase electric power from Shoshone and similar distribution cooperatives at prices substantially below the cost of power produced by Tri-State. Pacific thereupon entered into a Memorandum of Understanding with Shoshone to "purchase all of the assets" of Shoshone for a fixed price. The agreement between Pacific and Shoshone includes an indemnification clause under which Pacific agrees to indemnify Shoshone and its directors, officers and employees for any claims arising out of the sale of Shoshone's assets to Pacific. Memorandum of Understanding between Pacific Power & Light Company and Shoshone River Power, Inc., Dated October 3, 1985, at 3–4 (included as Exhibit 47, Addendum to Brief for Plaintiff-Appel-

---

1. Tri-State has outstanding loans of more than $600 million, and the government represents that outstanding loans made or guaranteed by the REA total in excess of $40 billion nationwide. Brief of the United States on Behalf of

the Rural Electrification Administration, the National Rural Electric Cooperative Association and the National Rural Utilities Cooperative Finance Corporation as Amici Curiae, at 3 [hereinafter cited as Government Amici Brief].

lant). The record indicates that Shoshone plans to distribute the proceeds of the sale to its constituent members, but it does not indicate whether Shoshone would then dissolve or whether Shoshone would retain any assets or perform any functions after the sale is completed. In any event, prior to selling its assets (the major component of which is the power-delivery subscriptions of its members and the minor part of which is its poles and power lines) to Pacific, Shoshone had to obtain: (1) approval of its members and (2) approval of the Wyoming Public Service Commission.

Before Shoshone could obtain either approval, Tri-State brought this action, alleging that Shoshone would breach its requirements contract by such a sale and seeking, among other things, to permanently enjoin the transaction between Pacific and Shoshone. Pursuant to a stipulation among the parties, the trial court initially entered a preliminary injunction. The stipulation allowed Shoshone to pursue approval of its members for the sale of the assets. To more easily obtain that approval, Shoshone amended its bylaws. The original bylaws required approval of two-thirds of the members of Shoshone before any sale of Shoshone's assets and did not allow proxy voting, making such approval difficult and cumbersome. Shoshone therefore amended its bylaws to allow absentee voting and consequently obtained approval of the sale by a vote of 1,036 to 99. However, of those who voted, 1,010 voted absentee; and Tri-State claims that absentee voting does not comport with Wyoming corporation law. Even so, it appears that an overwhelming majority of the members of Shoshone support the sale and its consequent short-term, lower power rates.

After Shoshone's members voted to approve the asset sale, Pacific moved to dissolve the existing injunction, while Tri-State moved to supplement the preliminary injunction. The trial court held a hearing to consider both motions. It then issued a supplemental preliminary injunction to allow the parties time to submit the evidence necessary for the court's final decision. Finally, approximately one month later, the trial court entered a new order containing findings of fact and conclusions of law, as well as dissolving the supplemental preliminary injunction. The court made no specific findings regarding the prerequisites for the issuance of a preliminary injunction. However, although it was not explicit, the trial court apparently reasoned that if Shoshone would breach its requirements contract by selling its assets to Pacific, damages would be adequate to compensate Tri-State.

Pacific and Shoshone immediately took steps to complete the sale of the assets, but the Wyoming Public Service Commission did not approve the sale until May 1, 1986. The decision of the Commission was appealed within a few hours after it was entered, and consequently the Wyoming courts stayed the sale. Even so, Pacific and Shoshone claim that the asset transfer was completed before the Wyoming appeal. The record, however, reflects that the transfer was not completed.

Tri-State appeals the trial court's dissolution of the preliminary injunction under 28 U.S.C. § 1292(a)(1) (1982). This court entered a temporary stay of the completion of the transaction between Pacific and Shoshone pending oral argument, and, after oral argument, continued that stay.

## II.

Tri-State asks this court to reverse the trial court's order dissolving the supplemental preliminary injunction. The narrow issue before this court is whether the trial court abused its discretion in dissolving the supplemental preliminary injunction. The issuance or dissolution of a preliminary injunction is within the sound discretion of the trial court and can be set aside only if it is based on an error of law or constitutes an abuse of discretion. *Kenai Oil & Gas, Inc. v. Department of Interior*, 671 F.2d 383, 385 (10th Cir.1982). Even so, Congress, in enacting section 1292(a)(1), recognized the serious consequences that can flow from erroneous denial of a preliminary injunction. Thus, although we may

not merely substitute our own judgment for that of the trial court, we must scrutinize with care the exercise of its discretion.

## III.

 The main purpose of a preliminary injunction is simply to preserve the status quo pending the outcome of the case. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir.1975). In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits. *Compact Van Equipment Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir.1978). Thus, this court must determine whether, in the interests of effective justice, a preliminary injunction should issue in the present case.

Although the trial court decided that Tri-State was not entitled to a preliminary injunction, it did not address the four factors articulated by this court that a moving party must demonstrate in order to obtain a preliminary injunction, namely: (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). Since the trial court did not specify which of the factors Tri-State failed to show, this court, to review the trial court's decision, must review each of the four factors.

### A. *Irreparable Injury*

 In federal courts, the moving party must show irreparable injury in order to obtain a preliminary injunction. *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Penn*, 528 F.2d at 1185. Injury is generally not irreparable if compensatory relief would be adequate. *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir.1985). Thus, Tri-State must show not only that it is injured by the failure to issue the preliminary injunction, but also that damages are not adequate to compensate that injury.

Tri-State first claims that its injury would be irreparable because it may not be able to collect a judgment if it wins on the merits. If Shoshone completes the sale to Pacific, Shoshone plans to distribute the proceeds of the sale to its members. Thus, Tri-State argues, any damage judgment against Shoshone would be difficult, if not impossible, to collect from Shoshone, because it would have no assets at the end of the trial. Shoshone, on the other hand, argues that Pacific has agreed to indemnify Shoshone, and, therefore, Tri-State would be able to collect damages from Pacific.

 Under Wyoming law, Tri-State may not be able to collect directly from Pacific. In *Hamlin v. Transcon Lines*, 697 P.2d 606 (Wyo.1985), the Wyoming Supreme Court held that a third party could not collect directly from the government under an indemnification statute, because the third party was not party to the statutory contract. Although we do not decide whether the Wyoming courts would extend *Hamlin* to a situation involving a private contract, Tri-State may have difficulty collecting a judgment. Difficulty in collecting a damage judgment may support a claim of irreparable injury. *Central States, Southeast & Southwest Areas Pension Fund v. Admiral Merchants Motor Freight, Inc.*, 511 F.Supp. 38, 43 (D.Minn.1980) (injury may be irreparable if defendants will be financially unable to pay damages), *aff'd per curiam sub nom. Central States, Southeast & Southwest Areas Pension Fund v. Jack Cole-Dixie Highway Co.*, 642 F.2d 1122 (8th Cir.1981); *Philipp Brothers Division of Engelhard Minerals & Chemicals Corp. v. El Salto, S.A.*, 487 F.Supp. 91, 95 (S.D.N.Y.1980) (difficulty in collecting money judgment may support claim of irreparable harm). If Tri-State cannot collect a money judgment, then failure to enter the preliminary injunction would irreparably harm it.

Furthermore, Tri-State also claims that allowing Shoshone to immediately sell its assets would jeopardize the viability of Tri-State. Shoshone is only one of twenty-five distribution cooperatives that are members of Tri-State. Tri-State argues that under present conditions in the electric power supply industry, many, if not all, of these cooperatives may wish to sell their assets in order to obtain lower utility rates for their members. If Shoshone is allowed to sell its assets now, other cooperatives will undoubtedly follow suit—perhaps before an ultimate decision on the merits that Shoshone, as well as these others, may not legally sell. As the distribution cooperatives sell their assets, and thereby decrease the demand for electric power from Tri-State, Tri-State's rates to the remaining cooperatives must increase, thereby pressuring these cooperatives to take advantage of the escape used by Shoshone. As a result of this "domino effect," Tri-State would be unable to repay its debts to the REA, would be forced into bankruptcy, and would likely collapse.

It is true that, in deciding whether a preliminary injunction should issue, we are only examining the possible course of events between the present time and the conclusion of the underlying litigation. On the merits, the court below may decide that Shoshone can legally sell its assets, notwithstanding Tri-State's predictions of the consequences. These consequences, however, could conceivably occur before the trial court's conclusion on the merits, in light of the armies of lawyers that other member cooperatives could amass to speedily execute such transactions. With the complexity of the interrelations in this case, we cannot facilely assume a swift resolution of the underlying dispute.

■ A threat to trade or business viability may constitute irreparable harm. See, e.g., Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125–26 (2d Cir.1984) (damages cannot fully compensate husband and wife for loss of years of effort and livelihood); John B. Hull, Inc. v. Waterbury Petroleum Products, Inc., 588 F.2d 24, 28–29 (2d Cir.1978) (possibility of going out of business is irreparable harm), cert. denied, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970) (loss of right to continue business may support claim of irreparable injury). Such threats are typically seen in antitrust actions, where the party seeking the preliminary injunction is faced with a complete or substantial loss of its business during the pendency of the trial unless the injunction issues. However, the same threat is present in this case. If a preliminary injunction is not issued, Shoshone will almost assuredly sell its assets. Furthermore, Tri-State has presented evidence which shows that other member cooperatives are also currently planning to sell their assets so as to avoid long-term requirements contracts.[2]

In fact, the United States' amicus brief in this action claims that not only the viability of Tri-State, but also the viability of the whole REA system is threatened by the sale of Shoshone's assets. If the preliminary injunction does not issue, Tri-State has no protection against the loss of its business while the litigation progresses. Rather, it would perhaps be left after a trial on the merits with an empty victory. Shoshone may be found to have breached its contract with Tri-State, but in the meantime Tri-State would have ceased to exist. Tri-State has adequately shown that without the preliminary injunction, it will suffer irreparable harm.

### B. Balancing the Injuries

Tri-State must also show that the injury to it if the injunction does not issue outweighs the injury to Shoshone and Pacific

**2.** We have pending before us an appeal in *United States v. Garland Light & Power Co.,* No. 86–2408 (10th Cir. filed Sept. 24, 1986). Garland is a distribution cooperative that is also a member of Tri-State that, like Shoshone, is seeking to sell its assets to Pacific. This at least lends support to Tri-State's claim that other cooperatives will mimic Shoshone in selling their assets.

if it does. *See Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 867 (7th Cir.1983).

Shoshone, at least as a preliminary matter, does not appear to be damaged by the postponement of this sale. The injury Shoshone is claiming is actually injury to Shoshone's subscribers who would receive a distribution of the sales proceeds and lower utility rates from Pacific in the interim between now and the sale of the assets. The only Shoshone subscribers who are parties to this action appear in their capacity as members of the board of directors of Shoshone. They do not, and cannot, claim any injury in their individual capacities. Thus, the only possible damage to Shoshone as an entity is the possible loss of the transaction between it and Pacific if Pacific should change its mind regarding the purchase during the pendency of the injunction. However, since the assets which Shoshone has agreed to sell to Pacific will not dissipate during the continuation of this litigation, Shoshone will suffer little—if any—injury, even if the sale is never completed. The assets will still be available for sale to another purchaser.

The possible damages Pacific might suffer from imposition of an injunction until the merits are decided would consist almost entirely of the loss of profits from the sale of electric power during that period. Such damages could be easily satisfied from the bond posted in this case should Tri-State lose on the merits.

■ Balanced against the possible dire consequences to Tri-State's existence, any injury incurred by Shoshone or Pacific from mere postponement of the sale is neither exceptional nor uncompensable with a money award. Because of the sheer complexity of the interrelated circumstances of this case, we believe that the relative harm that would occur by maintaining the status quo until the trial court has put its imprimatur on a resolution of the underlying issue is less than the harm that would flow from allowing Shoshone to immediately sell its assets.

C. *Public Interest*

■ Tri-State must also demonstrate that issuance of the preliminary injunction is not adverse to the public interest. *City of Chanute v. Kansas Gas & Electric Co.,* 754 F.2d 310, 312 (10th Cir.1985); *Carey v. Klutznick,* 637 F.2d 834, 839 (2d Cir.1980). The "public interest" in a public utility case is actually the interest of purchasers of electric power. The customers involved in the present case are both the customers of Shoshone and the customers of Tri-State. If the injunction issues, customers of Shoshone will be forced to pay higher electric bills than they would pay to Pacific—at least until the final decision in the case. On the other hand, if Shoshone is allowed to immediately sell its assets, thereby discontinuing purchase of electric power from Tri-State, Tri-State's other members—as well as those who purchase power from such members—will be forced to pay higher electric power bills and could even lose their source of electric power if final determination on the merits is protracted. As was the case in *Carey,* there are valid public-interest concerns on both sides of this case. Yet, the balance of the public-interest arguments favors issuing the injunction. Tri-State's customers face a greater threat than Shoshone's customers. Tri-State's customers may lose their source of electric power; Shoshone's customers will only be required to continue paying, until the conclusion of the litigation, the same Shoshone rate, albeit higher than Pacific's rate, that they have been paying in the past.

Moreover, looking beyond the "public interest" defined in the narrow sense described in *Carey*—the interests of the power consumers in this case, we conclude that the broader public interest also dictates that an injunction should issue. Both Tri-State and the United States claim that the viability of the REA program depends on the outcome of the merits in this case. Furthermore, if the injunction does not issue, they maintain, the federal government's program is immediately threatened, harming not only the customers of Tri-

State and customers of its member distribution cooperatives but also the customers of electrical cooperatives across the nation. It would be difficult, if not impossible, to compensate that pervasive injury through damages. The broad public interest in this case favors Tri-State's position. In essence, it would be easier to correct a mistake in favor of Tri-State in issuing an injunction than it would be to correct a mistake in favor of Shoshone and Pacific by not issuing it.

### D. *Probability of Success*

■ The fourth prerequisite for obtaining a preliminary injunction is a showing of a likelihood of success on the merits. In *Otero Savings & Loan Association v. Federal Reserve Bank*, 665 F.2d 275 (10th Cir. 1981), this court stated:

> The Tenth Circuit has adopted the Second Circuit's liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

*Id.* at 278 (quoting *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir.1964)). Tri-State has shown irreparable injury, that the balance of the hardships weighs in its favor, and that the injunction would not offend the public interest. Therefore, Tri-State need only show "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation" in order to satisfy the "probability of success" requirement.

The case below is one for breach of contract. The issue that will be argued and that we must examine to the extent necessary to determine the probability-of-success prong is whether Shoshone breaches its requirements contract with Tri-State by selling all its assets and nominally dissolving. Conventional case law dictates that no breach occurs when a party ceases to have requirements. *See, e.g., HML Corp. v. General Foods Corp.*, 365 F.2d 77, 82–83 (3d Cir.1966). In arguing that it is likely to succeed in this case, Tri-State asserts that the circumstances of this case are unique and that case law dealing with run-of-the-mill requirements contracts between private parties are not dispositive or even adequate for a rule of decision. They argue that the entire REA program is a result of a clear and compelling congressional policy to provide the economic means for supplying electricity to rural areas. Pursuant to that policy, distribution cooperatives, as an inducement to the REA to make loans to Tri-State, entered into joint and mutual convenants to purchase all of their power requirements from Tri-State. Those requirements contracts are not simple requirements contracts but rather interdependent, joint and mutual contracts with a common purpose of securing the REA loans and thereby effectuating the REA policy.

Further, Tri-State and the United States claim that if Shoshone is permitted to sell all of its assets and thereby cease to "have any requirements," it will spell the collapse of Tri-State and compel other member cooperatives, which will be unable to service independently the large debt of Tri-State, to similarly sell out to private suppliers if they can. Other generation cooperatives throughout rural America are in the same predicament as Tri-State. Thus, the threat to Tri-State is also a threat to the very existence of the REA and the policies implemented through it. This scenario, Tri-State and the government suggest, presents a compelling reason to avoid a mechanical application of conventional case law.

Moreover, Tri-State argues, allowing Shoshone to take advantage of the REA loan system at both its and Tri-State's level and then to sell out to Pacific constitutes an abuse of the federal program. The REA was formed to provide electric power to markets that were not attractive to private entities. Indeed, Shoshone probably would not exist if it were not for subsidies

received through the REA. Those subsidies are represented not only by loans to Shoshone, but also by loans to Tri-State. The federal government has, in effect, made it possible for Shoshone to provide electric power to its members. If Pacific is now allowed to purchase Shoshone's assets, it may be obtaining a federal subsidy without meeting the qualifications for such subsidy. At the very least, it may be purchasing both assets supported by federal dollars and a ready-made market created by a federal program without paying adequate compensation.

Shoshone and Pacific respond, in essence, that Shoshone's requirements contract with Tri-State is nothing more than a commonplace requirements contract. They urge that the law is that, absent a take-or-pay or some other special provision,[3] requirements contracts are terminable whenever the contracting party ceases to have requirements. In other words, they argue that a party does not breach a requirements contract if it ceases to have requirements, regardless of the impetus for the lack of requirements. Implicit in that argument is the assumption that when Shoshone sells its physical assets together with its subscriptions from its member consumers, it ceases to have requirements. It follows, then, that: (1) the sale of Shoshone's assets to Pacific does not constitute a breach of Shoshone's requirements contract with Tri-State; (2) the sale of Shoshone's assets lawfully terminates Shoshone's requirements; and (3) Tri-State is not legally damaged by the sale.

In turn, Tri-State retorts that the sale of Shoshone's physical assets and consumer subscriptions amounts to a sale of Shoshone's requirements in a fixed market where the consumers cannot choose their supplier. Shoshone thereby breaches its implied covenant to maintain those requirements. The effect of the sale would be that Shoshone could avoid its obligation to pay for capital expenditures made by Tri-State with proceeds from the REA loans

secured by Shoshone's requirements contracts. The sale converts taxpayer bounty to the private profit of Pacific. The sale, Tri-State maintains, does not satisfy the good-faith requirement imposed on Shoshone.

Courts diverge on the issue whether requirements contracts imply a good-faith responsibility to have requirements. For example, *compare HML Corp.*, 365 F.2d at 138–39 *with Diamond Alkali Co. v. P.C. Tomson & Co.*, 35 F.2d 117, 119–20 (3d Cir.1929). While not deciding the issue, it appears that in routine bilateral requirements contracts the greater weight of authority may be that, absent a take-or-pay clause or some other special circumstance, no such good-faith requirement should be implied. The difficulty for this court is that this case arises in an unusual context with no close parallel in the extant cases. The unique facts of this case are, by way of summary: (1) the federal government sponsored a program for providing electricity to rural areas which, for economic reasons, were not previously serviced by private entities; (2) Tri-State, Shoshone and the other member distribution cooperatives of Tri-State are nonprofit corporations organized specifically to take advantage of the federal program; (3) the REA specifically demands requirements contracts to carry out the congressional mandate requiring "reasonably adequate" security for loans to Tri-State; and (4) all members of Tri-State, including Shoshone, are parties to common requirements contracts.

While we may not supplant the trial court and comment on the merits of either side's position, we do conclude that Tri-State's arguments are clearly not frivolous. It is sufficient to note that the unique factual circumstances and history of this case make the resolution of the final question of law a genuinely debatable issue. Tri-State has raised questions going to the merits that are serious, substantial, difficult and doubtful. These questions are fair grounds for litigation, and the status

---

**3.** A take-or-pay provision requires a purchaser to pay a minimum amount regardless of its

actual use. Shoshone's contract with Tri-State contains no such provision.

**360**

quo should be maintained until a decision on the merits can be reached.

## IV.

Tri-State has satisfied its burden of showing that it is in the interests of justice to issue the preliminary injunction. Tri-State has demonstrated irreparable harm if the injunction does not issue, either because it will not be able to collect damages at the end of the trial or because its viability is threatened by the immediate sale of Shoshone's assets. Any harm from maintaining the status quo is less than the harm that would flow from allowing Shoshone to sell its assets. The public interest, and possibly the viability of the programs carried out by the REA, favor issuance of the injunction. Finally, the underlying merits involve questions of law that are serious, substantial, difficult, and doubtful and that are fair grounds for litigation. Therefore, the injunction in this case should issue.

While we are not sure whether the trial court's decision resulted from an error of law or an abuse of its discretion, we feel that it must be reversed. The order dissolving the preliminary injunction is reversed and the trial court is ordered to extend the injunction until completion of the trial on the merits.