931 F.2d 900
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
CRAMER PRODUCTS, INC., Plaintiff-counter-claim-defendant-Appellee,
v.
INTERNATIONAL COMFORT PRODUCTS, LTD., and Allor Medical,
Inc., Defendants-counter-claimants-Appellants.
 No. 90-3151.
 United States Court of Appeals, Tenth Circuit.
 April 30, 1991.
 
 Before STEPHEN H. ANDERSON and TACHA, Circuit Judges, and KANE,* District Judge.
 ORDER AND JUDGMENT**
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 2
 Defendants appeal from the district court's order entering a preliminary injunction. Plaintiff Cramer Products, Incorporated, commenced this action in November 1989, asserting claims for breach of contract, tortious interference with contract rights, and tortious interference with current and prospective business advantages and relationships, all arising from the purported breach of an exclusive distribution agreement entered into by plaintiff and defendant International Comfort Products, Limited (ICP).
 
 
 3
 ICP owns the patent to a protective heel cup, developed by ICP's president. The distribution agreement, executed in April 1982, gave plaintiff "the exclusive and nontransferable right to market and sell the [heel cup] to the sporting goods, athletic training and physical therapy markets in the United States and overseas...." Dissatisfied with plaintiff's promotional and marketing strategies, however, ICP began selling its products to defendant Allor Medical, Incorporated (Allor) for distribution in the exclusive markets granted plaintiff by the distribution agreement. This litigation followed.
 
 
 4
 After conducting an evidentiary hearing, the district court entered a preliminary injunction enjoining defendants from distributing and selling the heel cups, or from authorizing any party other than plaintiff to distribute or sell the heel cups, in "the domestic sporting goods, domestic athletic training, or domestic physical therapy markets in the United States of America." The district court did not include the "overseas markets" within the scope of the preliminary injunction.
 
 
 5
 This court will review a district court order granting or denying a preliminary injunction for an abuse of discretion and will set aside the district court's determination only if it is based upon an error of law or constitutes an abuse of discretion. Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 354 (10th Cir.1986). In order to be entitled to a preliminary injunction, the moving party bears the burden of establishing that 1) the moving party will suffer irreparable injury without the injunction; 2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; 3) the injunction, if issued, will not be adverse to the public interest; and 4) there is substantial likelihood that the moving party will eventually prevail on the merits. Id. at 355.
 
 
 6
 The district court determined that plaintiff had satisfied all four requirements and, therefore, issued the preliminary injunction. On appeal, defendants challenge only the district court's determination concerning the fourth requirement, that plaintiff established the substantial likelihood that it would prevail on the merits of its claims.
 
 
 7
 An initial issue presented on appeal is what standard plaintiff had to meet to satisfy the fourth injunctive requirement. Plaintiff asserts that, where, as in the instant appeal, it had satisfied the first three requirements for preliminary injunctive relief, plaintiff need only establish that it had raised questions so serious, substantial, difficult and doubtful as to make them fair ground for litigation. See, e.g., id. at 358. Defendants argue, however, that, because the preliminary injunction issued by the district court was a mandatory, rather than a prohibitory, injunction, plaintiff was required to meet a heightened standard by establishing that the law and facts clearly favored plaintiff's success on the merits of its claims. See Zurn Constructors, Inc. v. B.F. Goodrich Co., 685 F.Supp. 1172, 1180-81 (D.Kan.1988). We need not determine which of these standards applied to plaintiff's request for preliminary injunctive relief because, under either standard, plaintiff satisfied the fourth requirement.
 
 
 8
 The evidence before the district court established the following: Plaintiff and ICP entered into an agreement in April 1982, which gave plaintiff exclusive distribution rights, in specific markets, to promote and sell ICP's protective heel cups. See Distribution Agreement, p 2. ICP entered this agreement because ICP's president believed that plaintiff was "a huge, awesome, penetrating company that had the ability to penetrate all the retail sporting goods market...." Transcript, Hearing on Request for Preliminary Injunction, 95.
 
 
 9
 The distribution agreement included a provision requiring plaintiff to "use its best efforts to market and sell the Product into the sporting goods, athletic training, and physical therapy markets and to promote the Product to universities, high schools, and other groups and institutions which include or sponsor athletic programs, and to the sporting goods trade." Distribution Agreement, p 5. A second provision of the agreement required plaintiff to "use its best efforts to advertise and promote the Product, including the following," then listing specific efforts plaintiff agreed to undertake to promote and market the heel cups. Distribution Agreement, p 10.
 
 
 10
 ICP's president disagreed with, and became disappointed in, some of plaintiff's marketing and promotional strategies, particularly those aimed at the retail sporting goods market. In the foreign retail market, for example, although plaintiff's president testified that plaintiff had "worked very hard in the foreign market," plaintiff experienced "less results that [sic] [plaintiff was] happy with." Tr. 62. ICP's president testified that, in light of plaintiff's lack of success in those foreign markets, ICP began selling its products to other companies for distribution in the foreign markets. Id. at 111. ICP asserted that plaintiff was aware of this and acquiesced. Id. Plaintiff's president acknowledged that plaintiff was aware of ICP's use of other distributors in other markets. Id. at 63.
 
 
 11
 ICP's president further suggested that the parties' conduct concerning the foreign markets had served to modify the distribution agreement. See Byers Transp. Co. v. Fourth Nat'l Bank & Trust Co., 333 F.2d 822, 825 (10th Cir.1964) (applying Kansas law) (parties to contract free to alter, modify, abrogate or rescind contract; agreement to do so may be implied from parties' conduct).
 
 
 12
 Q. ... Did you ever make anyone at Cramer aware that others were selling Tuli Heel Cups in the foreign markets?
 
 
 13
 A. Yes....
 
 
 14
 Q. Did anyone at Cramer ever object to the foreign sales?
 
 
 15
 A. No. Because, as [Cramer's president] said, they hadn't developed the market, and I went ahead and developed it and the way we always had treated this type of area was they did the best they could where they did, and I tried to pick up the slack around them when they didn't perform in a certain area that was glaringly deficient.
 
 
 16
 Tr. 111 (direct examination).
 
 
 17
 Q. And as far as you're concerned, that exclusive distribution contract is still in effect with Cramer Products?
 
 
 18
 A. With the modifications we've seemed to agree upon over the years, yes.
 
 
 19
 Q. Right. And you admit that you are violating it by dealing with Allor who is selling in Cramer's product market?
 
 
 20
 A. In the letter of the contract, yes, but not the intent that [Cramer's president] and I have had over the years.
 
 
 21
 Id. at 127 (cross-examination).
 
 
 22
 Although ICP asserted that it was disappointed with plaintiff's overall promotional and marketing efforts, ICP allowed the exclusive distribution agreement to be renewed twice, in August 1985 and August 1988, because ICP considered plaintiff
 
 
 23
 a very important part of [ICP's] program ... they do a good job where they work. They work in The First Aider, which is trainers, coaches, schools and team sales. And there's probably nobody better. The only comparative company would be Meiller and why change. And I don't think a telemarketer could do as good in that particular market as they do. They are good at what they do. I never denied that. But for retail sporting goods, chain stores, they're not driven, and that's what it takes to break down these monstrous retail store programs.
 
 
 24
 Id. at 118.
 
 
 25
 ICP admitted that, although it considered the distribution agreement to remain binding on the parties, albeit perhaps in a modified form, id. at 127, because ICP continued to be unhappy with plaintiff's lack of success in the retail sporting goods market, it began selling its products to Allor for distribution in plaintiff's exclusive markets, in violation of the specific terms of the parties' agreement. Id. Immediately upon becoming aware of Allor's presence in its exclusive domestic markets, plaintiff complained to ICP, who assured plaintiff it would take care of the problem. ICP, however, did not request Allor cease its activity in plaintiff's markets but continued to sell to Allor with the intention that Allor distribute in these markets. See id. at 128-29. Eventually, plaintiff again complained to ICP concerning Allor, and ICP acknowledged to plaintiff that ICP had no intention of preventing Allor's distribution in these markets, in light of Allor's successful results. See id.
 
 
 26
 Defendants first argue that the district court based its issuance of the preliminary injunction on conflicting findings of fact and conclusions of law. The district court determined plaintiff had established a substantial likelihood it would succeed on the merits of its breach of contract claim, Memorandum and Order, 15-16, yet the district court also determined, in limiting the preliminary injunction to domestic markets, that plaintiff had not yet established the "likelihood of success with regard to foreign markets." Id. at 17. Defendants' second argument further asserts that the district court erred in dividing the distribution agreement into two separate areas, foreign markets and domestic markets.
 
 
 27
 In light of the testimony of ICP's president asserting that the parties' conduct modified the distribution agreement as it pertained to the foreign markets, tr. 111, 127, the district court's two findings were not sufficiently contradictory to undermine the district court's determination that plaintiff would likely prevail on the merits of its breach of contract claim. Further, in light of plaintiff's president's testimony that, although plaintiff had worked the foreign markets very hard, it had not achieved successful results in those markets, id. at 63, the district court's attempt to tailor narrowly the scope of the preliminary injunction, to defendants' benefit, does not appear to have been an abuse of discretion. See Community Communications Co. v. City of Boulder, 660 F.2d 1370, 1380 (10th Cir.1981), cert. dismissed, 456 U.S. 1001 (1982) (relief pending litigation must be tailored narrowly to minimize irreparable harm to both sides and at the same time to permit meaningful grant of whatever permanent relief warranted).
 
 
 28
 Defendants next argue that the district court erred in ordering specific performance of the distribution agreement because plaintiff failed to establish that plaintiff had satisfied all of its obligations under the contract and, in particular, the "best efforts" provisions. This argument, too, lacks merit.
 
 
 29
 First, the district court's order addressed only the issue of preliminary injunctive relief and, therefore, was not a final resolution of the merits of plaintiff's claims. See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1185 (10th Cir.1975). Even though the preliminary injunction required ICP to abide by the terms of the distribution agreement, the purpose was not to award plaintiff specific performance as final relief, but to preserve the status quo between the parties pending the final resolution of the litigation. Tri-State Generation, 805 F.2d at 355; cf. Ferry-Morse Seed Co. v. Food Corn, Inc., 729 F.2d 589, 593 (8th Cir.1984) (where status quo is condition, not of rest, but of action, and condition of rest will cause irreparable harm, mandatory preliminary injunction proper).
 
 
 30
 Secondly, ICP's president asserted that, although ICP was disappointed with plaintiff's efforts, ICP still considered the distribution agreement binding on the parties. Tr. 127. Contrary to its argument on appeal, therefore, ICP asserted to the district court that plaintiff had not breached the agreement.
 
 
 31
 Thirdly, the district court made specific findings of fact concerning plaintiff's efforts to promote and market ICP's heel cups and, as a conclusion of law, determined that plaintiff had "presented substantial evidence demonstrating that it complied with the best efforts provision as to the domestic market." Memorandum and Order, 16. The record supports these findings.
 
 
 32
 Defendants correctly assert that the district court did not make a specific finding concerning plaintiff's compliance with the best efforts provision concerning the foreign markets, but did determine that "[a]t this stage, [plaintiff] has failed to make the requisite showing of its likelihood of success with regard to foreign markets...." Id. at 17. Nonetheless, in light of defendants' assertion that the agreement had been modified as it applied to the foreign markets, the lack of a finding that plaintiff satisfied the "best efforts" provisions in the foreign markets does not affect the district court's determination on the probability of plaintiff's success on the breach of contract claim.
 
 
 33
 As further support for the previous argument, defendants next argue that the district court erred in interpreting the second "best efforts" provision to limit the first "best efforts" clause. The record supports the district court's interpretation of the two "best efforts" provisions in the agreement.
 
 The district court found that
 
 34
 [s]ince [plaintiff's] marketing philosophy is one of creating demand through education and ICP prefers a more short term approach, paragraph 10 of the distributor agreement was added by [plaintiff] to further define and limit the "best efforts" requirement. Paragraph 10 obligates [plaintiff] to: advertise in its First Aider magazine which is distributed to 100,000 coaches, athletic directors and trainers, conduct direct mailings, publicize Tuli's heel cups at listed shows and conventions, provide for promotion in [plaintiff's] catalogs and price lists, and to promote through [plaintiff's] sales force, which personally calls on dealers.
 
 
 35
 Id. at 4. The district court's interpretation of the contract's language is reasonable. See Barnhart v. McKinney, 682 P.2d 112, 120 (Kan.1984) (in construing written instrument, law favors reasonable, rather than unreasonable, interpretation, quoting Garvey Center, Inc. v. Food Specialities, Inc., 519 P.2d 646, 649 (Kan.1974)). Cf. John Gruss Co. v. Paragon Energy Corp. (In re John Gruss Co.), 22 Bankr. 236, 240 (Bankr.D.Kan.1982) (applying Kansas law) (in interpreting written instrument, all terms should be given reasonable effect, if possible, quoting Restatement (Second) of Contracts Sec. 229).
 
 
 36
 Further, assuming the inclusion of two "best efforts" provisions was sufficiently ambiguous to allow admission of parole evidence, see NEA-Goodland v. Board of Educ., U.S.D. No. 352, 775 P.2d 675, 679 (Kan.App.1989) (where contract ambiguous, intention of parties may be determined by consideration of circumstances surrounding execution of contract), the uncontradicted testimony of plaintiff's president completely supported the district court's determination. Plaintiff's president testified that, because plaintiff's promotional and marketing strategies were conservative and very different from the ideas of ICP's president, plaintiff requested the inclusion of the second "best efforts" provision in order to make clear to ICP's president how plaintiff intended to promote and market ICP's heel cups. Tr. 25-26. Cf. Desbien v. Penokee Farmers Union Co-op. Ass'n., 552 P.2d 917, 923 (Kan.1976) ("In ambiguous contracts where there is uncertainty between the general and the specific provisions relating to the same thing, the specific provisions ordinarily qualify the meaning of the general provisions, the reasonable inference being that the specific provisions express more exactly what the parties intended.").
 
 
 37
 Defendants' final argument on appeal is that the district court erred in determining plaintiff will likely succeed on its two tortious interference claims, asserted against Allor, because plaintiff cannot establish that ICP breached a valid and binding contract between plaintiff and ICP. In light of our determination that plaintiff did establish the likelihood of its success on the breach of contract claim, this appellate argument must also fail.
 
 
 38
 The order of the United States District Court for the District of Kansas is AFFIRMED.
 
 
 
 *
 Honorable John L. Kane, Senior District Judge, United States District Court for the District of Colorado, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3