**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 12 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

PAULA KEIRNAN, individually and
on behalf of a class of similarly
situated individuals,

     Plaintiff-Appellant,

v.

UTAH TRANSIT AUTHORITY, a
Utah DBA and special transportation
district; JOHN M. INGLISH, UTA
Executive Director; ORRIN T.
COLBY, JR.; WILLIAM R.
WILLIAMS; NECIA CHRISTENSEN;
TERRY DIEHL; BIAO CHANG;
WALTER D. TALBOT; MONTA RAE
JEPPSON; JOHN B. UPDIKE;
HOWARD RIGTRUP; STEVEN K.
RANDALL; ROBERT W. DAVIS; D.
BRENT HALES, Members, UTA
Board of Trustees,

     Defendants-Appellees.

No. 02-4098

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:02-CV-0175-B)**

---

John Pace (Robert B. Denton and Sonia K. Sweeney with him on the briefs) of
Disability Law Center, Salt Lake City, Utah, for Plaintiff-Appellant.

Scott A. Hagen (James S. Jardine, Robert O. Rice, and D. Zachary Wiseman with
him on the brief) of Ray, Quinney & Nebeker, Salt Lake City, Utah, for
Defendants-Appellees.

Before **HARTZ** and **McKAY**, Circuit Judges, and **BRORBY**, Senior Circuit Judge.

**McKAY**, Circuit Judge.

Appellant Keirnan has been an unconditionally eligible paratransit rider pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12131, *et seq.*,[1] for the past four years. She has been riding Utah Transit Authority (UTA) paratransit for these past four years without incident. Appellant uses an electric wheelchair which weighs 612 pounds when occupied and is longer than forty-eight inches when her leg rests are included in the length. Appellant's leg rests are extended because she is unable to bend her knees. UTA's entire paratransit fleet is equipped to handle larger mobility devices such as Appellant's.

In December 2001, for reasons not fully apparent in the record, UTA issued

---

[1]    The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. 12131(2) (1995).

notice that, effective March 2002,[2] it was terminating the paratransit eligibility of all otherwise eligible paratransit riders whose mobility devices exceeded the dimensions of a "common wheelchair."[3]  Of the approximately 6,500 UTA paratransit riders, approximately thirty have had their eligibility terminated due to mobility device size – that is, less than one-half of one percent.  Appellant is one of these thirty riders.  Her 612-pound wheelchair exceeds the weight restriction by twelve pounds.  Additionally, her device exceeds the forty-eight-inch length restriction when her leg rests are included in the length.  Therefore, Appellant, an otherwise qualified individual with a disability, is now ineligible for paratransit services because of the new size and weight restrictions.

UTA has been operating under the ADA and United States Department of Transportation (DOT) standards since their inception.  As detailed above, for reasons unclear in the record, UTA decided to adopt its own standards which are reflected in the service change at issue.  As a basis for this change, UTA used

---

[2]Subsequent to the filing of this case, UTA agreed to suspend implementation of its service change until July 2002.  Aplt. App. at 196.

[3]       *Wheelchair* means a mobility aid belonging to any class of three or four-wheeled devices, usable indoors, designed for and used by individuals with mobility impairments, whether operated manually or powered.  A "common wheelchair" is such a device which does not exceed 30 inches in width and 48 inches in length measured two inches above the ground, and does not weigh more than 600 pounds when occupied.

49 C.F.R. § 37.3 (2002).

minimum requirements which are set forth in the DOT regulations. The DOT does not purport to establish maximums or other restrictions based on size and weight of a mobility device.

Title II of the ADA requires public transit authorities to provide people with disabilities paratransit services that are "comparable" to those provided to others on the fixed route system. The services required by the ADA are those that conform to the service criteria developed by the DOT. The DOT promulgated regulations dealing both with rider eligibility and service criteria. Among the DOT's service criteria are the definitions of "wheelchair" and "common wheelchair." 49 C.F.R. § 37.3 (2002). The regulations further state that "[a]ll common wheelchairs and their users shall be transported." 49 C.F.R. § 37.165(b) (2002).

In an Interpretative Guidance, the DOT unequivocally stated that mobility devices that exceed the common wheelchair standard do not have to be carried. The Interpretative Guidance states that "[d]evices used by individuals with disabilities that do not fit this [common wheelchair] envelope, (e.g., ma[n]y "gurneys") do not have to be carried."[4] 49 C.F.R. § 37, App. D (2002).

---

[4]     The definition of "wheelchair" includes a wide variety of mobility devices. This inclusiveness is consistent with the legislative history of the ADA. While some mobility devices may not look like many persons'

(continued...)

-4-

Appellant filed a motion in the district court to enjoin UTA's service change which limits the size and weight of wheelchairs carried by its transit system to the common wheelchair standard as defined in 49 C.F.R. § 37.3. Appellant also filed a motion for a preliminary injunction. The district court denied Appellant's motion for a preliminary injunction; Appellant appeals this denial.

We will only set aside a denial of a preliminary injunction "if it is based on an error of law or constitutes an abuse of discretion." Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 354 (10th Cir. 1986); see also Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234,

---

[4](...continued)
> traditional idea of a wheel chair, three and four wheeled devices, of many varied designs, are used by individuals with disabilities and must be transported. The definition of "common wheelchair," developed by the Access Board, is intended to help transit providers determine which wheelchairs they have to carry. The definition involves an "envelope" relating to the Access Board requirements for vehicle lifts.
>
> A lift conforming to Access Board requirements is 30"x48" and capable of lifting a wheelchair/occupant combination of up to 600 pounds. Consequently, a common wheelchair is one that fits these size and weight dimensions. Devices used by individuals with disabilities that do not fit this envelope (e.g., ma[n]y "gurneys") do not have to be carried.

49 C.F.R. § 37, App. D (2002) (internal citation omitted).

1243 (10th Cir. 2001). A preliminary injunction serves to preserve the status quo pending a final determination of the case on the merits. Tri-State, 805 F.2d at 355. "In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits." Id. In order to obtain a preliminary injunction, Appellant must show:

> (1) [She] will suffer irreparable injury unless the injunction issues;
> (2) the threatened injury . . . outweighs whatever damage the
> proposed injunction may cause the opposing party; (3) the injunction,
> if issued, would not be adverse to the public interest; and (4) there is
> a substantial likelihood [of success] on the merits.

Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).

It does not appear from its Order of June 7, 2002, that the district court specifically ruled on the first three factors. However, at the hearing, the court did state that the first three factors are "probably not where this issue turns. I think if you can persuade me that you have a likelihood of success on the merits, then I would be inclined to grant an injunction." App. of Exhibits, Vol. II, at 382. In its denial of a preliminary injunction, the district court seemed so persuaded that Appellant did not have a substantial likelihood of success on the merits that it did not take a clear position on the first three factors.

That being said, we agree with the district court that the fourth factor is determinative. The first three factors weigh heavily in Appellant's favor. The first factor, that "[she] will suffer irreparable injury unless the injunction issues,"

has been demonstrated by Appellant in her briefs and at the hearing. Resolution Trust, 972 F.2d at 1198. She will lose the ability to attend religious services and medical appointments. She will also lose contact with friends and family. Appellant and other paratransit riders affected by the service change will be incapable of living their lives in the independent fashion to which they have become accustomed. Additionally, because Appellant is not alleging intentional discrimination or out-of-pocket expenses, damages might not be available should a court later find in her favor on the merits. See Tri-State, 805 F.2d at 355 ("Injury is generally not irreparable if compensatory relief would be adequate."); see also App. of Exhibits, Vol. II, at 378-80; Powers v. MJB Acquisition Corp., 184 F.3d 1147 (10th Cir. 1999) (compensatory damages not available under section 504 of the Rehabilitation Act unless intentional discrimination); Tyler v. City of Manhattan, 118 F.3d 1400 (10th Cir. 1997) (compensatory damages for mental and emotional injury not available under ADA absent intentional discrimination).[5]

The second factor, that "the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party," also supports Appellant's position. Resolution Trust, 972 F.2d at 1198. Surely Appellant will

---

[5]The Tyler court did not specifically address the issue of whether a plaintiff could seek compensatory damages for violations of the ADA without alleging intentional discrimination. 118 F.3d at 1403-04.

suffer a great deal more at the loss of her independence than UTA will suffer in continuing to provide service to Appellant and others as it has done for years. Additionally, while UTA stresses linkage concerns, UTA has offered no documented information regarding the severity of these concerns.[6]  Furthermore, this is UTA's sole offer of negative impact on it if a preliminary injunction were to issue.

UTA also stresses that it should not be penalized for merely complying with DOT regulations.  However, we are at the preliminary injunction stage.  "[I]n deciding whether a preliminary injunction should issue, we are only examining the possible course of events between the present time and the conclusion of the underlying litigation."  Tri-State, 805 F.2d at 356.  UTA has the opportunity to make its argument on the merits at the district court level.  Additionally, UTA would simply be required to provide the service it has provided for years without significant documented burden until a final decision on the merits.

The third factor, which takes into account the public interest, also weighs in Appellant's favor.  A preliminary injunction would simply maintain the status quo pending a final determination on the merits.  Because UTA has been

---

[6]UTA suggests that because fixed route buses do not necessarily accommodate oversized mobility devices, it may have trouble linking fixed route and paratransit buses.  However, UTA has been providing this service for years without any documented linkage problem.

providing this service without any documented detriment to the public, we fail to see how a temporary extension would harm the public interest in any capacity. Appellee is unable to point to anything adverse to the public interest should the preliminary injunction issue.

Because the first three factors favor Appellant, we must turn to the final factor in order to determine if a preliminary injunction should issue.[7] "The fourth prerequisite for obtaining a preliminary injunction is a showing of a likelihood of success on the merits." Tri-State, 805 F.2d at 358. It is unclear from the hearing and the district court's order whether the court applied the correct legal standard in its determination of this factor. "The Tenth Circuit has adopted the Second Circuit's liberal definition of the 'probability of success' requirement." Otero Savings & Loan Ass'n v. Federal Reserve Bank, 665 F.2d 275, 278 (10th Cir. 1981). We have previously stated:

> When a party seeking a preliminary injunction satisfies the first three requirements, the standard for meeting the fourth "probability of success" prerequisite becomes more lenient. The movant need only show "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation."

Resolution Trust, 972 F.2d at 1199 (citing Tri-State, 805 F.2d at 358); Otero, 665

---

[7] "[N]o matter how we answer the question whether petitioner's showing was sufficient to support the injunction, further proceedings in this case may lead to a contrary result." Pharmaceutical Research and Mfrs. of Am. v. Walsh, __ U.S. __, 123 S. Ct. 1855, 1866 (2003).

F.2d at 278.

In its order, the district court held that there was "no reasonable expectation of success on the merits of this case." App. of Exhibits, Vol. II, at 409. Thus, it is unclear if the district court applied the more lenient standard set forth in Otero. In our review, we must apply the correct legal standard. Therefore, we must ask, in light of the standard expressed in Resolution Trust, if the district court abused its discretion in denying a preliminary injunction.

In its discussion of probability of success, the district court was faced with the following situation. The ADA contains no minimum standards and explicitly directs the DOT to issue regulations that define minimum standards. 42 U.S.C. § 12143(c)(3) (1995). The ADA itself makes no mention of maximum standards. The DOT regulations clearly establish minimum standards. 49 C.F.R. § 37.165(b) (2003). Then, in an Interpretative Guidance, the DOT unequivocally states that mobility devices that exceed the common wheelchair standard do not have to be carried. The Interpretative Guidance states that "[d]evices used by individuals with disabilities that do not fit this [common wheelchair] envelope, (e.g., ma[n]y "gurneys") do not have to be carried." 49 C.F.R. § 37, App. D (2003).

The district court necessarily had to determine the probable effect of the DOT's statement that common wheelchairs must be carried and the further effect of the Interpretive Guidance which states that larger devices need not be carried.

In its analysis, the district court was obligated to apply the deferential framework provided by <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>  In <u>Chevron</u>, the Supreme Court stated:

> The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.  If congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.  Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.  In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

467 U.S. 837, 843-44 (1984) (internal quotations and citations omitted); <u>see</u> <u>also</u> <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations. . . . [T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (internal quotations omitted); <u>Smith v. Midland Brake, Inc.</u>, 180 F.3d 1154, 1165 n.5 (10th Cir. 1999) (en banc) (EEOC's interpretative guidance of ADA regulations given controlling weight pursuant to <u>Thomas Jefferson</u>).

In our analysis, we start with the premise that a preliminary injunction would have a very minimal impact on UTA.  A preliminary injunction would only

-11-

maintain the status quo pending a final decision on the merits.  That being said,

we are mindful of our appellate role.  As detailed above, this is a situation of

double deference.  The question we must resolve is whether the district court

abused its discretion in its application of Chevron deference.  Therefore, even

though we may disagree with the district court's determination, it would be very

difficult to reverse the denial of the preliminary injunction when viewing the case

through the lens of double deference.

In giving controlling weight to the DOT's interpretation of its own

regulations, the question is whether the pronouncement is plainly erroneous or

inconsistent with the regulations.  The regulations do not affirmatively require

public transit authorities to carry mobility devices larger than a common

wheelchair, regardless of the rider's eligibility.  Rather, they state that "[a]ll

common wheelchairs and their users shall be transported."  49 C.F.R. § 37.165(b).

Since the regulations implementing Title II remain silent of any duty to carry

oversized wheelchairs, we cannot hold that the interpretive guidance is plainly

erroneous or inconsistent on that ground.

Interestingly, Appellant did not raise the argument that refusing to transport

her in her oversized mobility device violates the general nondiscrimination

obligation for entities providing transportation service.  49 C.F.R. § 37.5(a) states

that "[n]o entity shall discriminate against an individual with a disability in

connection with the provision of transportation service." Since Appellant "is capable of using that service," there is a possible conflict between 49 C.F.R. § 37.5 and § 37.165. The issue is not focused on or adequately developed for us to decide. Since we are only resolving the issue of a preliminary injunction, Appellant is free to raise this argument at the district court level.

For the foregoing reasons, the decision of the district court denying Appellant's motion for a preliminary injunction is AFFIRMED.