HEATRON, INC., Plaintiff,

v.

Gary SHACKELFORD, Defendant.

Civ. A. No. 95–2306–EEO.

United States District Court,
D. Kansas.

Aug. 30, 1995.

Tim S. Haverty, Norman E Beal, Hillix, Brewer, Hoffhaus, Whittaker & Wright, L.L.C., Kansas City, MO, for plaintiff.

Kirk W. Lowry, Palmer & Lowry, Topeka, KS, Stephen L. Andrew, D. Kevin Ikenberry, Tulsa, OK, for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court on defendant's motion to transfer venue (Doc. # 4), and plaintiff's application for preliminary injunction (Doc. # 7). For the reasons stated below, defendant's motion to transfer is denied. Plaintiff's application for preliminary injunction is granted insofar as set forth in this order.

### I. Defendant's Motion to Transfer Venue.

Defendant Shackelford contends that this case should be transferred to the United States District Court for the Northern District of Oklahoma pursuant to 28 U.S.C. § 1404(a). To warrant a transfer of venue, the moving party must show that the transfer is for "the convenience of the parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). The party seeking the transfer carries the burden of showing that the action should be transferred. *Ammon v. Kaplow*, 468 F.Supp. 1304, 1313 (D.Kan.1979). The decision of whether to grant a party's motion to transfer is within the sound discretion of the district court. *See Triple A Partnership v. MPL Communications, Inc.*, 629 F.Supp. 1520, 1526 (D.Kan. 1986).

In his motion, Shackelford contends that transfer to Oklahoma is warranted "because an action addressing issues identical to those raised in this case is pending in that court and because those issues must be re-solved in accordance with Oklahoma law." Shackelford asserts that because he filed a suit in Oklahoma three days before Heatron filed suit in Kansas, the first-filed suit should be given priority.

Proper analysis of this issue requires a recounting of the following facts: Heatron advised Shackelford and Delta Manufacturing Corporation, by letters dated June 21, 1995, that Shackelford's employment with Delta Manufacturing Corporation violated the noncompetition covenant Shackelford had signed with Heatron. The June 21, 1995, letters further advised Shackelford and Delta that unless Shackelford ceased work for Delta, Heatron would bring suit to enforce the covenant. On June 26, 1995, Shackelford and Delta filed a declaratory judgment action in the United States District Court for the Northern District of Oklahoma. On June 29, 1995, Heatron filed a lawsuit in the District Court of Leavenworth County, Kansas, seeking to enforce the covenant. That suit was subsequently removed to this court.

In determining which of two simultaneously pending cases should proceed, courts generally follow the first-to-file rule. *Koch Eng'g Co., Inc. v. Monsanto Co.*, 621 F.Supp. 1204, 1207 (E.D.Mo.1985). However, courts do not follow the first-to-file rule where special circumstances exist that justify giving priority to the later-filed action. Courts in this district have held special circumstances to exist where the first-filed suit is a declaratory judgment action triggered by receipt of a notice letter:

> [T]he first suit filed has priority, unless there are circumstances which justify giving priority to the later-filed action. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978), *cert. denied*, 440 U.S. 908 [99 S.Ct. 1215, 59 L.Ed.2d 455] (1979). One circumstance the court may consider is whether the declaratory judgment action was filed in apparent anticipation of a coercive suit for damages. *See Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 (5th Cir.1983).... Whether the declaratory judgment action was triggered by a notice letter is an additional equitable consideration in the court's decision whether to allow the later-filed

action to proceed. *Factors, Etc., [Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 219 (2d Cir. 1978), *cert. denied,* 440 U.S. 908 [99 S.Ct. 1215, 59 L.Ed.2d 455] (1979)].

*Venture Corp. v. J.L. Healy Constr. Co.,* No. 88–1351–T, 1988 WL 131354, at *2 (D.Kan. Nov. 22, 1988) (other citations omitted). *Accord, Providence–St. Margaret Health Center v. Stone, Marraccini and Patterson,* No. 89–2007–S, 1989 WL 59010 (D.Kan. May 2, 1989); *Curtis Machine Co. v. Paul E. Robey & Assoc.,* No. 88–1626–K, 1989 WL 8056 (D.Kan. Jan. 30, 1989); *Beech v. Gemini,* No. 87–1667 (D.Kan. Feb. 24, 1988).

The court finds that the defendant's lawsuit in Oklahoma was filed in anticipation of plaintiff's suit for enforcement of the non-compete agreement. Indeed, in a letter dated June 26, 1995, written by Shackelford's counsel to Heatron's counsel, Shackelford as much as admits that the suit in Oklahoma was filed in anticipation of Heatron's suit. The letter states: "Because of recent correspondence received by our clients from Heatron, Inc. threatening litigation over the hiring of Gary Shackleford [sic] by Delta Manufacturing, the decision has been made to seek declaratory relief in the United States District Court in and for the Northern District of Oklahoma." Exhibit D to Heatron's Memorandum in Opposition to Defendant's Motion to Transfer. We are of the view that Shackelford, by bringing this declaratory judgment action, has sought to deprive Heatron (the natural plaintiff) of its traditional choice of forum and timing. In short, Shackelford has used the declaratory judgment procedure to create "a disorderly race to the courthouse." *Providence–St. Margaret,* 1989 WL 59010 at *2 (quoting *State Farm Fire & Casualty Co. v. Taylor,* 118 F.R.D. 426, 430 (M.D.N.C.1988) (quoting *Hanes Corp. v. Millard,* 531 F.2d 585, 592–93 (D.C.Cir.1976))).

Therefore, the court will deny Shackelford's motion to transfer.

II. *Plaintiff's Application for Preliminary Injunction.*

After carefully considering the parties' briefs, oral arguments, testimony at the hearing, and exhibits, the court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

*Findings of Fact*

1. The plaintiff, Heatron, Inc., (hereinafter plaintiff or Heatron) is a Missouri corporation with its place of business in Leavenworth, Kansas. The defendant, Gary Shackelford, is an individual and former employee of Heatron, who now resides in Tulsa, Oklahoma.

2. Heatron originally filed suit in the District Court of Leavenworth County, Kansas. Shackelford timely removed the case to federal district court pursuant to 28 U.S.C. § 1441. This court has diversity jurisdiction, as the action is between citizens of different states and the amount in controversy exceeds $50,000.

3. Heatron is engaged in the manufacture of commercial and industrial heating elements, and has three basic product lines: cartridge heaters, flexible heaters, and band heaters. The cartridge heaters and flexible heaters divisions each make up approximately 40% of Heatron's sales, with band heaters accounting for the rest.

4. Heatron currently has approximately 213 employees. Heatron estimates its revenues for 1995 will be approximately ten million dollars.

5. H.B. Turner, Vice–President of Heatron and employed in sales and marketing, testified that Heatron's cartridge heater division has approximately ten major competitors, each with annual sales exceeding five million dollars. These competitors are located in the following states: Alabama, California, Illinois, Maine, Massachusetts, Michigan, Missouri, and Pennsylvania. Heatron actively competes with these companies for sales to its customers, who are located throughout the United States, including those areas served by Heatron's competitors.

6. Michael Keenan, president of Heatron, testified that Heatron regarded Shackelford as a "key player." In 1991, Shackelford was promoted to team leader for the cartridge division, where he was responsible for scheduling, inventory control, training, and had full control of the entire process. Shackelford prototyped and tooled the machinery and, together with the chief engineer, designed the machinery. The techniques and process-

es currently used by Heatron have been actively developed since 1978.

7. In certain instances, competitors have been unable to duplicate plaintiff's sequences, techniques and processes. Heatron has developed products that no other company manufactures, such as thermal controls used inside heating elements. In addition, plaintiff manufactures several types of cartridge heaters which have little or no competition, as a result of the product's unique design and qualities. In particular, plaintiff has developed a specialty of manufacturing cartridge heating elements for use in kidney dialysis machines. These heaters are required to meet very exacting specifications with respect to heating tolerances, corrosion resistance, and electrical leakage. Plaintiff developed specific processes and techniques for polishing and sealing heating elements for this application. Plaintiff's competitors have been unsuccessful in manufacturing cartridge heaters with the necessary qualities for kidney dialysis machines. A German manufacturer attempted to reverse-engineer Heatron's design, but failed.

8. Plaintiff also has a specialty in the manufacture of heating elements for use in photo processing industries, and estimates that its heating elements are used in a large percentage of all x-ray equipment built in the United States. Plaintiff has little competition in this particular segment of its industry.

9. Pat McKinzie, an engineer at Heatron and product manager for the cartridge heaters division, testified regarding the specific manufacturing requirements for Heatron's cartridge heaters. The stages of manufacture of a cartridge heater involve twelve to twenty-five processing steps, and are unique to Heatron. The sequence of steps followed in the construction of cartridge heaters significantly affects the efficiency of the product line and the quality of the heaters produced. Shackelford knew the configuration of Heatron's production line and why it was so configured.

10. Twelve to eighteen of the forty machines that Heatron uses on its production line are unique to Heatron, and were either designed and built by Heatron or to Heatron's specifications. Many of the more standard machines have been modified specifically to Heatron's specifications. Other machines use individual tooling made to Heatron's specifications. It is his special tooling that makes the machines unique. As of June 16, 1995, when Shackelford left the company, Shackelford knew how most of these unique machines were manufactured.

11. McKinzie testified that Heatron developed certain configurations of its machines and computerization of processes that gives Heatron a strong competitive advantage. McKinzie was unaware of any competitor of Heatron that is fully computerized like Heatron. Because of these innovations, Heatron can build a heater "from scratch" and at a very fast pace, resulting in a response time to customers of from six to seventy-two hours. As a result of plaintiff's computerization, it has developed a "quick-turn delivery program," which is very desirable to customers in the industry. Shackelford had detailed knowledge of the computerization process, and knew the vendor.

12. The cartridge heaters that Heatron manufactures are made to very exacting specifications and very critical tolerances. For example, the diameter of heating elements must be within 3/1000 of an inch, after the cartridge has undergone a "swaging" process that compacts all of the internal components of the cartridge. When asked whether a competitor of Heatron would be able to duplicate a Heatron product if so requested by one of Heatron's customers, Keenan testified that because the tolerances are so "tight" and exacting, not many would be able to duplicate the product, but that he believed Shackelford could.

13. Heatron estimates it has spent five to ten million dollars in developing its cartridge heater production line. Heatron believes that such sequences, techniques, and processes give it an advantage over most competitors in producing high quality, low tolerance cartridge heating elements. Heatron estimates the value of its technology and know-how between five and ten million dollars.

14. Heatron considers information concerning its unique manufacturing processes, techniques, products, programs, and its specialized machinery and tooling to be confidential and to constitute trade secrets. Hea-

tron has taken steps to protect this information, to wit: Heatron uses a proprietary stamp on all designs; Heatron requires all employees to sign a confidentiality agreement; and the employee manual informs employees that any violation of confidentiality is grounds for immediate termination.

15. Heatron participates in a prisoner work program with the Kansas State Correctional Facility and the Federal Military Disciplinary Barracks in Leavenworth, Kansas. Approximately forty inmates work for the company at the present time, and comprise approximately one-fifth of the work force. Keenan testified that the inmates are not subject to covenants not to compete, because they have very limited process knowledge and are not employed long enough to participate in cross-training of company processes.

16. Shackelford graduated from high school in 1982, and then attended and completed a vocational program at Beck Vocational School in St. Louis. In 1984, Shackelford was hired by a competitor of Heatron, WatLow Electric Company (WatLow), as an assembler, and later worked as a production line technician. Shackelford left WatLow to attend DeVry Institute, where he received a certification in electronics. Upon receiving his certification, defendant went to work for Emerson Electric as a production technician.

17. In March 1988, Shackelford was hired by Heatron as a technician, where he performed heater failure analysis. In 1991, Shackelford was promoted to team leader for Heatron's cartridge heater division. As team leader, Shackelford had overall responsibility for all production aspects of the cartridge heater line, including hiring, firing, and supervising employees, resolving production difficulties and supplier and customer problems, developing new production techniques, designing cartridge heaters to customer specifications, and analyzing production problems and heater failures. Shackelford became intimately familiar with all aspects of plaintiff's manufacture of cartridge heaters. During his employment at Heatron, Shackelford became familiar with many of Heatron's customers and the products Heatron manufactured for them.

18. In 1989, Heatron employees who either had knowledge of customer lists or who dealt with manufacturing processes were asked to sign non-competition agreements. Only those employees that plaintiff believed were key to its business, and that could significantly damage the company if they left Heatron to work for a competitor, were requested to sign these agreements. Approximately fifteen percent of plaintiff's employees currently have non-compete agreements with plaintiff.

19. The pertinent provisions of the agreement are contained in paragraphs 1, 2, and 4. These paragraphs provide:

1. During the full time of his or her employment by the Company, and for a period of one year after that employment ceases (for whatever reason), the Employee covenants and agrees that he or she will not, directly or indirectly, engage in any activities on behalf of any business marketing products or services competitive with those being marketed or under development by the company at the time his or her employment terminates. This limitation extends to all manner of activity, as an owner, employee, consultant, advisor, lender or otherwise, having the tendency to further the business objectives of such a competing business.

2. The Company markets its products on a nationwide basis and the industry for its products is an industry encompassing the entire United States. Accordingly, the limitations of paragraph 1 apply to activities by the Employee within the United States. The Employee acknowledges that the area of effective competition for the Company in its business extends beyond 350 miles from its business locations and he or she agrees that the restrictions imposed by this Covenant within the areas indicated are reasonably necessary to protect the Company's business and its existing customer relations. The Employee further covenants and agrees that should a court at any time determine that these restrictions, as they apply to the Employee, are unreasonable or unenforceable they will be deemed amended so as to provide the maximum protection to the Company deemed reasonable and enforceable by the

court, it being the Employee's intention to give the Company an enforceable covenant.

4. The Employee will not at any time, except in connection with his or her performance of services for the Company disclose the following to anyone: (i) the identity of the Company's customers; (ii) any information about the Company's customers; (iii) any information not generally known concerning the Company's products (material content for example); (iv) any information concerning products under development by the Company; (v) any information concerning the Company's marketing activities and plans (for example, plans to open up a new sales territory); (vi) any trade secrets or other information concerning manufacturing techniques and methods employed by the Company which the Employee knows or has reason to know are considered proprietary and confidential by the Company (a highly efficient method of manufacturing, for example).

20. Shackelford voluntarily signed the covenant not to compete on November 2, 1989. Shackelford admitted that, at the time he signed the covenant, he did not intend to abide by the restrictions if they were an impediment to future opportunities he might have. Although Shackelford disagreed with various factual statements in the covenant, he made no objection to it at the time he signed it.

21. Shackelford was not informed by anyone in plaintiff's management that he would be fired if he refused to sign the covenant; Shackelford, however, assumed that his continued employment was conditioned upon signing the agreement. Keenan, president of Heatron, testified that if Shackelford had refused to sign the covenant, Shackelford would not have been fired, although his opportunities for promotion within the company would have been significantly reduced.

22. On June 16, 1995, Shackelford voluntarily resigned to accept employment with Delta Manufacturing Company (hereinafter Delta) located in Tulsa, Oklahoma. Delta is a direct competitor of plaintiff in the manufacture and sale of band heaters. Because Delta had been unsuccessful in its attempts to develop a cartridge heater line, it retained a headhunter to find an individual who could assist Delta with cartridge heaters. Shackel-

ford was recruited by the headhunter, and offered a position at Delta because of his past experience working for Heatron and Wat-Low. Shackelford accepted employment with Delta, in exchange for direct compensation of $50,000 per year, and a promise by Delta's owner to eventually sell the business to him.

23. Shackelford gave Heatron advance notice of his resignation, but did not inform Heatron that he had accepted a position with Delta. Shackelford does not dispute that, by accepting employment with Delta, he breached the covenant not to compete that he had signed with Heatron.

24. Shackelford testified that once employed at Delta, he discussed with Delta Heatron's vendors and customers. Shackelford testified he also discussed with Delta Heatron's assembly line process for production of cartridge heaters. He stated that Delta's goal is to achieve the same kind of success Heatron has with respect to cartridge heaters. Shackelford has in at least one instance provided blueprints to one of Heatron's component manufacturers that are substantially identical to Heatron's blueprints of the same component. Heatron considers such blueprints proprietary, confidential, and to constitute trade secrets.

### Conclusions of Law

■ The purpose of issuing a preliminary injunction is to preserve the status quo during the pendency of an action. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). In order to be entitled to a preliminary injunction, a plaintiff must demonstrate: (1) it will suffer irreparable injury unless the preliminary injunction issues; (2) the threatened injury to plaintiff outweighs whatever damage the proposed injunction may cause to defendant; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is substantial likelihood that plaintiff will eventually prevail on the merits. *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986) (citing *Lundgrin,* 619 F.2d at 63).

■ A preliminary injunction is an extraordinary remedy that is the exception

rather than the rule. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir.1984). Because of its extraordinary nature, the right to relief must be clear and unequivocal. *Wilson v. Bruce*, 816 F.Supp. 679 (D.Kan.1993). The decision to grant or deny injunctive relief is within the sound discretion of the trial court and will be set aside only if the ruling is based on an error of law or constitutes an abuse of discretion. *Kenai Oil and Gas, Inc. v. Dep't of Interior*, 671 F.2d 383, 385 (10th Cir.1982).

▆ The Tenth Circuit has adopted a modified interpretation of the "likelihood of success" requirement. If the first three requirements for a preliminary injunction are satisfied, then the movant can establish the fourth requirement, likelihood of success, by merely showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litigation and deserving of more deliberate investigation. *City of Chanute v. Kansas Gas and Electric Co.*, 754 F.2d 310 (10th Cir.1985); *Otero Sav. & Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275 (10th Cir.1981).

### A. Substantial Likelihood of Success on the Merits.

Heatron seeks to enjoin Shackelford from breaching the covenant not to compete. Specifically, Heatron seeks a preliminary injunction prohibiting Shackelford from continuing his employment with Delta.

▆ As a threshold matter, we note that Kansas law, not Oklahoma law, governs construction of the covenant. A district court sitting pursuant to diversity jurisdiction must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The well-established law in the state of Kansas is that the place of contract formation governs breach of contract actions. *General Electric Capital Corp. v. Selph*, 718 F.Supp. 1495, 1496 (D.Kan.1989). *See also Dow Chemical Corp. v. Weevil–Cide Co., Inc.*, 630 F.Supp. 125, 127 (D.Kan.1986) (In Kansas, the *lex loci contractus* rule means the law where the contract is made governs the contract); *Simms v. Metropolitan Life Ins. Co.*, 9 Kan.App.2d 640, 642, 685 P.2d 321, 324 (1984) ("Under Kansas law, choice of which state's law is applicable to the construction of a contract depends on where the contract is made."). The parties do not dispute that the covenant was executed by Shackelford in Kansas while he was employed by Heatron in Kansas; thus we will apply Kansas law in resolving the issues before the court.

▆ Under Kansas law, a noncompetition agreement is valid and enforceable where three conditions are met. First, the agreement must be a valid and enforceable contract under general principles of contract law. *Eastern Distributing Co. v. Flynn*, 222 Kan. 666, 670, 567 P.2d 1371, 1376 (1977); *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 543–544, 493 P.2d 205, 210 (1972). Defendant challenges the general validity of the contract as unsupported by good consideration. A noncompetition clause must be supported by valid consideration to be enforceable. *Puritan–Bennett Corp. v. Richter*, 8 Kan.App.2d 311, 313, 657 P.2d 589, 591 (1983); *Evco Distributing, Inc. v. Brandau*, 6 Kan.App.2d 53, 626 P.2d 1192 (1981). Under Kansas law, there is a rebuttable presumption that contracts are supported by consideration. *Uarco, Inc. v. Eastland*, 584 F.Supp. 1259, 1262 (D.Kan.1984) (citing *Ferraro v. Fink*, 191 Kan. 53, 379 P.2d 266 (1963)). Defendant suggests that the covenant lacks adequate consideration because after defendant signed the agreement, he "received nothing in return for signing th[e] agreement other than the annual raises he had been promised when he first went to work at Heatron."

▆ Upon review of the facts, however, the court is convinced that the noncompetition agreement was supported by valid consideration. Continued employment can, under appropriate circumstances, constitute sufficient consideration. In *Puritan–Bennett Corp. v. Richter*, 8 Kan.App.2d 311, 657 P.2d 589 (1983), the court held that there was sufficient consideration because evidence showed that the employee had been retained, promoted, and entrusted with company secrets for a significant period of time after signing the covenant. *Puritan–Bennett Corp.*, 8 Kan.App.2d at 315, 657 P.2d at 592. Similarly, in the instant case, Heatron pre-

sented evidence that after Shackelford signed the covenant in 1989, he was promoted to team leader for the cartridge division, where he was responsible for the entire process and helped design and develop products. Keenan testified that if Shackelford had refused to sign the agreement, he would not have been promoted.

The second requirement for judicial enforcement of a noncompetition agreement is that the employer must have a legitimate proprietary interest to protect. *Eastern Distributing*, 222 Kan. at 671, 567 P.2d at 1376; *Evco Distributing, Inc. v. Brandau*, 6 Kan.App.2d 53, 58, 626 P.2d 1192, 1197. The mere desire on the part of an employer to prevent ordinary competition does not qualify as a protectable interest, and is not sufficient justification to enforce a covenant not to compete. *Eastern Distributing*, 222 Kan. at 671, 567 P.2d at 1376. Kansas courts have long recognized the employer's right to maintain confidentiality of trade secrets or other commercially sensitive information pertaining to the employer's business practices as an interest entitled to protection. *Puritan–Bennett Corp.*, 235 Kan. at 256–57, 679 P.2d at 212; *Koch Engineering Co. v. Faulconer*, 227 Kan. 813, 828, 610 P.2d 1094, 1104–05 (1980); *Mills v. Ressler*, 87 Kan. 549, 554, 125 P. 58, 60 (1912).

Defendant contends that he should not be enjoined from employment at Delta because he does not possess any information that would constitute trade secrets, but only "skill and general knowledge" that he acquired from his work at Watlow and Heatron. We find, based on the uncontroverted facts, that Heatron has demonstrated a likelihood of prevailing on the merits, inasmuch as the information at issue (*i.e.*, Heatron's processes, techniques, manufacturing specifications, and tolerances) may likely constitute a protectable proprietary interest under the laws of Kansas.

Heatron presented evidence that the technology it developed has independent economic value, insofar as it is not readily ascertainable through proper means by other persons who could obtain economic value from it, nor is it information readily known outside the business. McKinzie testified that it would not be possible for a competitor to reverse engineer a Heatron cartridge heater. Keenan estimated the value of the Heatron technology and know-how for the cartridge heater line to be worth approximately five to ten million dollars, and that Heatron has spent an estimated five to ten million dollars in developing its cartridge heater production line.

We also find that Heatron took steps that were reasonable under the circumstances to maintain the secrecy of information by stamping as confidential all designs, requiring all employees to sign a confidentiality agreement, and informing them that any violation of confidentiality would be grounds for termination.

McKinzie testified that no competitor had full computerization of processes as did Heatron, and that the specific production line sequences and many machines were unique to Heatron. Additionally, plaintiff presented evidence that the exacting specifications and critical tolerances used by Heatron are not known or used by competitors.

Heatron presented evidence that the techniques and processes it currently uses for manufacture of cartridge heaters have been under development since 1978, and were perfected through trial and error. The evidence at the hearing revealed that it may take Delta a year to simulate Heatron's processes, but that whatever length of time it would take Delta, the time would be significantly shortened by the benefit of Shackelford's knowledge.

We conclude that the evidence presented at the hearing supports a finding that Heatron possesses protectable, confidential information concerning development and production of cartridge heaters.

The third condition required for judicial enforcement of non-compete agreements is that the agreement must be reasonable, based upon the particular facts of the case. *Eastern Distributing*, 222 Kan. at 670, 567 P.2d at 1376; *H & R Block*, 208 Kan. at 544, 493 P.2d at 210; *Foltz v. Struxness*, 168 Kan. 714, 718, 215 P.2d 133, 137 (1950). Although there is no rigid, absolute norm by which the reasonableness of a covenant not to compete may be determined, the restric-

tions must be reasonable under the facts and circumstances of each case, *H & R Block*, 208 Kan. at 544, 493 P.2d at 210, and no greater than fairly required for the protection of the employer. *Puritan–Bennett Corp.*, 235 Kan. at 254, 679 P.2d at 211. In addition, a covenant not to compete is to be strictly construed against the employer. *Id.*, 208 Kan. at 544, 493 P.2d at 211.

■ Heatron, in its complaint, requests that the court enter a preliminary injunction prohibiting Shackelford from continuing his employment with Delta. The terms of the covenant, however, as well as the law, require us to enforce the restrictions of the covenant insofar as is reasonable. Even in circumstances where a covenant is overbroad as drafted, courts will enforce the covenant to the extent reasonable to protect the interests of the employer. Paragraph 2 of the covenant provides, in part:

> The Employer further covenants and agrees that should a court at any time determine that these restrictions, as they apply to the Employee, are unreasonable or unenforceable they will be deemed amended so as to provide the maximum protection to the Company deemed reasonable and enforceable by the court, it being the Employee's intention to give the Company an enforceable covenant.

Construing the contract in this manner, the court finds, under the facts and circumstances of this case (and on the limited record we have before us at this time), that it would be reasonable to enforce the covenant to prohibit Shackelford from working for Delta as an employee in the cartridge heater division for a period of one year. We further believe that it would be reasonable to enforce the non-disclosure provisions set forth in paragraph 4 of the covenant. We are of the view that such restrictions are reasonable and enforceable, and provide the protection to Heatron, as bargained for under the contract, while imposing no greater restraint on Shackelford than necessary to protect Heatron's legitimate interests in its proprietary information. Further development of the record may disclose the necessity for broadening the enforcement of the non-compete provisions.

Other courts have similarly held. *See, e.g., FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir.1982) (Appellate court reversed district court's order denying preliminary injunction, and held that (1) company's former employee should be preliminarily enjoined from divulging any information constituting a trade secret that he acquired during his work for company, and (2) company's direct competitor, which had hired former employee, was enjoined from placing or maintaining him in position that posed inherent threat of disclosure or use of company's trade secrets.); *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 902 (Tex.Civ.App.1978) (Appellate court reversed district court's order enjoining former employee from disclosing confidential information relating to assembly line for string line lawn trimmers, but refusing to enforce covenant not to compete, and held that trial court abused its discretion in failing to include in injunction order a provision restraining former employee from continuing in employment of competitor in any capacity related to such competitor's manufacture of string line lawn trimmers. The appellate court reasoned: "[The former employee] set up the assembly line by which the product was produced [by his former employer]. Even in the best of good faith, [he] can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work. The only effective relief for [the former employer] is to restrain [him] from working for [the competitor] in any capacity related to the manufacture ... of a flexible line trimming device.") *See also Allis–Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.*, 255 F.Supp. 645, 654–55 (E.D.Mich.1966) (court held injunction against disclosure and use of information inadequate; former employer would also be enjoined from working for competitor in the design and development of distributor type fuel injection pumps); *E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp.*, 41 Del.Ch. 533, 535, 200 A.2d 428, 430 (1964) (trial court granted a preliminary injunction prohibiting former employee from (1) divulging or disclosing the plaintiff's trade secrets and confidential information and (2) from accepting any employment with competitor in connection with, or related to, de-

velopment of a chloride process, despite the absence of a covenant not to compete).

In light of the foregoing determination, we need not at this time consider the question whether the nationwide scope of the non-compete clause of the covenant, as drafted, is reasonable.

Also, the court finds that the time limitation regarding competition is not unreasonable under the circumstances. The restriction against competition is effective only for a one-year period. This court has held covenants prohibiting competition for two years, in the context of solicitation of customers, to be reasonable. *See Equifax Servs., Inc. v. Hitz,* Civ.A. No. 89–2047–S, 1989 WL 35965 (D.Kan. March 8, 1989), *aff'd,* 905 F.2d 1355 (10th Cir.1990). *See also Eastern Distributing Co., Inc. v. Flynn,* 222 Kan. 666, 567 P.2d 1371 (1977) (one year prohibition against competition held reasonable).

We conclude that Heatron has presented a substantial likelihood that it will succeed on the merits against defendant.

### B. *Irreparable Injury.*

■ Heatron presented evidence that it will suffer irreparable harm without a preliminary injunction. Shackelford admitted that he has already discussed with Delta information regarding Heatron's vendors and customers, and Heatron's assembly line process for production of cartridge heaters. Keenan estimated the value of the Heatron technology and know-how for the cartridge heater line to be worth approximately five to ten million dollars, and that Shackelford's employment with one of Heatron's competitors would essentially deprive Heatron of the competitive advantage it has spent years and millions of dollars to build. We are satisfied that Heatron has at this stage met its burden of demonstrating a real and substantial threat of unlawful use or disclosure of its confidential, proprietary information.

Furthermore, the evidence suggests that it would be impossible to precisely calculate the amount of damages Heatron would suffer because of the inherent difficulty in quantifying the loss of Heatron's competitive advantage in the marketplace, and the damages resulting from loss of customers and good will. Thus, a money judgment would be inadequate to protect and compensate Hea-

tron. Accordingly, the court concludes that Heatron has sufficiently demonstrated that it would suffer irreparable harm in the absence of a preliminary injunction.

### C. *Balance of Harms.*

■ As the foregoing discussion of irreparable harm illustrates, the harm to Heatron in the absence of a preliminary injunction would be great. On the other hand, while it may pose some hardship on Shackelford to be prohibited from working for Delta in the cartridge heaters division and imparting information covered by paragraph 4 of the confidentiality clause, we find that on balance, the possible hardship to Shackelford is greatly outweighed by the likely hardship to Heatron upon disclosure of confidential, proprietary information to a competitor. Moreover, we believe that the bond amount set forth in this order adequately protects and compensates Shackelford for any harm should Heatron not prevail at trial.

### D. *Public Interest.*

■ The enforcement of valid contracts is in the public interest. *Uarco Inc. v. Eastland,* 584 F.Supp. 1259, 1262 (D.Kan. 1984). Moreover, the public has an interest in restraining unfair competitive practices. *Olin Water Servs. v. Midland Research Labs.,* 596 F.Supp. 412 (E.D.Ark.1984) (applying Kansas law). We believe that the issuance of a preliminary injunction enjoining Shackelford from working at Delta in the cartridge heater division and enjoining him from disclosing any information set forth in paragraph 4 of the covenant would not be adverse to the public interest.

■ In light of our conclusions that Heatron has sufficiently demonstrated irreparable harm, the greater balance of harms, and that an injunction would not be adverse to the public interest, the court is of the view that Heatron has raised questions going to the merits that are serious and substantial and present fair grounds for litigation, so as to make the issues deserving of more deliberate investigation. Thus, we find Heatron has fulfilled the modified standard for the "likelihood of success" requirement, adopted by the Tenth Circuit in *Otero Sav. & Loan Ass'n v.*

*Federal Reserve Bank,* 665 F.2d 275 (10th Cir.1981).

We note, however, that the above findings of fact and conclusions of law are made on the basis of the evidence before the court at this stage, and are not in any manner intended to be a final decision on the merits.

IT IS THEREFORE ORDERED that defendant Shackelford's motion to transfer venue (Doc. # 4) is denied.

IT IS FURTHER ORDERED that plaintiff Heatron's application for preliminary injunction (Doc. # 7) is granted insofar as: (1) Shackelford is hereby enjoined from working for Delta Manufacturing Corporation in any position that poses an inherent threat of disclosure or use of Heatron's confidential information, and in particular, Shackelford is prohibited from working in, or assisting Delta with, its cartridge heater division; and (2) Shackelford is enjoined from divulging to Delta Manufacturing Corporation, or any officer, employee, or agent thereof: (i) any information concerning the identity of Heatron's customers; (ii) any information about Heatron's customers; (iii) any information not generally known within the industry concerning Heatron's products (material content, for example); (iv) any information concerning products under development by Heatron; (v) any information concerning Heatron's marketing activities and plans (for example, plans to open new sales territories); (vi) any trade secrets or other information concerning manufacturing techniques or methods employed by Heatron which Shackelford knows or should know are considered proprietary or confidential by Heatron (for example, a highly efficient method of manufacturing); and (vii) any trade secrets or other information concerning manufacturing techniques or methods employed by Heatron which a reasonably prudent employee in the industry would consider proprietary or confidential to an employer.

This preliminary injunction is granted on the condition that plaintiff post, within fourteen (14) days, a bond in the amount of $50,000 to assure payment to defendant of his present salary for the remaining portion of the one-year period plus damages, in the event plaintiff does not ultimately prevail in this litigation.