**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 26 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SIZEWISE RENTALS, INC., a Kansas
corporation,

        Plaintiff - Appellee,

    v.

MEDIQ/PRN LIFE SUPPORT
SERVICES, INC., a Delaware
corporation,

        Defendant - Appellant.

No. 00-3051

(D. Kansas)

(D.C. No. CV-99-2304-GTV)

---

**ORDER AND JUDGMENT** *

---

Before **TACHA** , **ANDERSON** , and **EBEL** , Circuit Judges.

Mediq/PRN Support Services, Inc. ("Mediq") appeals the entry of a

preliminary injunction in favor of SizeWise Rentals, Inc. ("SizeWise"). The

injunction prohibits Mediq until November 2000, or until arbitration between the

parties is complete, from leasing certain medical equipment to certain hospitals

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

and facilities which had leased such equipment from Mediq during the period of an agreement between Mediq and SizeWise. We affirm.

## BACKGROUND

SizeWise is a Kansas corporation that, since 1994, has been in the business of distributing and leasing bariatric equipment to hospitals and other health care facilities. Bariatric equipment is equipment specifically designed for patients weighing over 350 pounds. [1] SizeWise was one of the first companies to market bariatric equipment "as a 'full room environment,' which means marketing a set of bariatric products as a complete package to care for all the needs of obese patients." SizeWise Rentals, Inc. v. Mediq/PRN Life Support Servs., Inc., 87 F. Supp. 2d 1194, 1196 (D. Kan. 2000). SizeWise engages in no other business activities. It has seven to ten employees and annual gross revenues of approximately $6 million.

Mediq is a Delaware corporation that distributes and leases a variety of hospital and medical equipment. It is the largest distributor of medical products in the United States, with annual gross revenues of approximately $300 million.

---

[1] As the district court found, SizeWise's "product line includes bariatric hospital beds, air mattresses, wheelchairs, commodes, walkers, lifts, and transfer systems." SizeWise Rentals, Inc. v. Mediq/PRN Life Support Servs., Inc., 87 F. Supp. 2d 1194, 1196 (D. Kan. 2000).

Mediq strives to provide "one stop shopping" for its customers by offering a complete line of medical products, including such specialty lines as bariatric equipment.

In November 1997, SizeWise and Mediq entered into a "Consignment for Rent/Rental Agreement," pursuant to which, from November 1, 1997, until October 31, 1999, SizeWise agreed to supply a set of eight bariatric products, which Mediq would rent to facilities in certain territories (ultimately fifty counties in nine states). During the course of the Agreement, Mediq leased SizeWise's equipment to customers in the territories. Mediq entered into the leases with the facilities and billed them. SizeWise retained ownership of the equipment and maintained liability insurance for it. Mediq and SizeWise shared the revenues generated through the leases.

The district court made the following additional findings about the conduct of the two parties to the Agreement:

> [SizeWise] also provided marketing and technical training to [Mediq's] employees at its Ellis, Kansas facility, employed four regional managers who assisted [Mediq] with marketing and training, and provided a toll-free telephone number for users of the equipment. Over the course of the term of the Agreement, [Mediq] leased [SizeWise's] equipment to approximately 268 hospitals, health care facilities, or other facilities.

Id. at 1197.

The record supports those findings: Mediq employee Andrew Wood testified that "SizeWise provided us with product information, pamphlets, brochures, marketing materials, and put on, to the best of my knowledge, two training sessions and one sales meeting." Tr. of Hr'g at 18, J.A. at 129. [2] SizeWise's president, Trever Frickey, testified that SizeWise conducted sales training for the Mediq personnel who leased the equipment and provided them with brochures and materials, and he stated that SizeWise personnel "also went out into the field and taught the people who could not come to training how to sell and service the equipment." J.A. at 166. Mr. Frickey further testified that SizeWise's regional managers "went out and worked with the sites to directly market our products in the facilities and help them open doors." Id. at 170. When asked if he and his fellow regional managers, "actually go to the hospitals to help co-market these products," he responded, "yes, we did." Id. at 171. [3]

---

[2]There was some disagreement at oral argument of this case as to which party produced a specific SizeWise "rollout manual." The record reveals that one particular "rollout manual" was produced by a Mediq employee. See Tr. of Hr'g at 19-21, J.A. at 130-32. As Mr. Wood testified, however, apparently other pamphlets and brochures were produced by SizeWise.

At oral argument, Mediq's counsel more generally challenged the district court's factual findings, asserting that the court "fabricated them out of nowhere." We have carefully reviewed the record and, as this opinion indicates, the district court's findings are supported by evidence in the record. Mediq's counsel's representation to this court to the contrary was both incorrect and misleading.

[3]Mr. Frickey described more specifically how he assisted in "co-marketing" SizeWise equipment with Mediq personnel:

(continued...)

Mr. Frickey also testified that he:

was in charge of the Wisconsin sites so [he] worked with facilities in that Wisconsin area, including the University of Wisconsin, to try and help get a contract for both of our companies for bariatrics as well as frameless air support therapy. I worked with Froedert Memorial Hospital, the Vincor in Milwaukee. I did make a call to the Aurora system in that area to try and gain some business, but we were unsuccessful with that.

Id. at 172. When asked if he was "involved in assisting Mediq in negotiating long-term contracts," Mr. Frickey stated that he was in "some" cases. Id. at 173.

He also testified that SizeWise maintained a 24-hour toll free telephone number to answer questions concerning SizeWise equipment. See id. at 174.

The Agreement contained the following covenant:

---

[3](...continued)
Normally what we would do is we would go in and we would use the SizeWise line to get an appointment because most of the time people were always willing to deal with looking at this product line since sometimes it was something they couldn't get from very many people so, therefore, we could get an appointment with that and we would talk about how to manage their bariatric patients, and that sometimes they need our products and you never need us until you really need us. You never know when you're going to have somebody, you know, six, seven hundred pounds there at that facility. And then what we would do after we got done bidding the SizeWise product and got in the door, they would usually conclude with stating that they had other products as far as air support therapy and things of that nature that could also help their regular sized patients.

Tr. of Hr'g at 62, J.A. at 173. He also testified that one of SizeWise's regional managers, Tim McCarty, performed a similar function in developing the Tempe, Arizona, market. See id. at 197.

8. Piracy, Trade Secrets and Confidential Information

. . .

(b) During the term of this Agreement and for a period of one (1) year immediately following the termination of this Agreement, [Mediq] shall not: (i) call upon, solicit, divert or take away, or accept rental business for Specialty Equipment from any customer in the Territory that has been referred to [Mediq] by SizeWise or (ii) directly or indirectly request or advise any present or future customers of SizeWise within the Territory to withdraw, curtail, alter or cancel their business with SizeWise. It is specifically acknowledged, understood and agreed by [Mediq] that the covenant against piracy as provided in this paragraph 8(b) is a material inducement for SizeWise to retain the services of [Mediq], to grant the Territory to [Mediq] and to allow [Mediq] limited use of the SizeWise tradenames and trademarks and access to the trade secrets and proprietary and confidential information referenced below, and that SizeWise would not enter into this Agreement, agree to retain the services of [Mediq] or grant such rights or access absent this covenant.

J.A. at 41-42. Section 8 also contained the following provision:

(c) [T]he provisions contained in subparagraphs 8(a) and 8(b) shall not apply to a situation where a customer insists that it rent obese patient aids manufactured or distributed by an entity other than SizeWise. In such a situation [Mediq] agrees that it will consult with SizeWise and that it will use reasonable efforts to convince said customer to first rent the [SizeWise] equipment as opposed to renting obese patient aids manufactured or distributed by an entity other than SizeWise. In the event, however, that following such consultation and efforts, the customer nevertheless insists that it be provided with a product manufactured by an entity other than SizeWise, [Mediq] shall be permitted, without penalty, to rent such products . . . to said customer.

Id. at 42.

In mid-1999, the relationship between SizeWise and Mediq apparently broke down. In July 1999, SizeWise filed its complaint, seeking damages and

- 6 -

injunctive relief, alleging that during the term of the Agreement, and "unbeknownst to [SizeWise], [Mediq] acquired a number of companies that were direct competitors of [SizeWise]. After said acquisitions, and during the [Agreement] term, [Mediq] began selling, renting and marketing obese patient aids other than [SizeWise's] products within the [territories subject to the Agreement] and outside [those territories]." Complaint at ¶ 13, J.A. at 17-18. The Complaint further alleged that "[i]n acquiring [SizeWise's] competitors and then selling, renting and marketing similar products, [Mediq] utilized the Confidential Information provided to it by [SizeWise]." Id. at ¶ 14, J.A. at 18. SizeWise alleged that Mediq had also breached the Agreement in various other ways.

By its own terms, the Agreement expired on October 31, 1999. On November 9, 1999, SizeWise filed a motion for a temporary restraining order and a preliminary injunction, seeking to restrain Mediq from violating section 8(b)(ii) of the Agreement.

The court conducted a hearing on December 17, 1999, at which SizeWise's officers testified, as well as an employee of Mediq and an expert in the field of marketing bariatric products. Willard Frickey, the owner and founder of SizeWise, testified that, although the Agreement provided that Mediq would bill the customers to whom SizeWise bariatric equipment was leased, he considered

- 7 -

those customers to be customers of both Mediq and SizeWise. See Tr. of Hr'g at 29, J.A. at 140. Trever Frickey testified that he was concerned that a violation of section 8(b) would affect "referrals of business that you get from existing business." J.A. at 184. Mediq employee Andrew Wood testified as to the desirability of establishing "long-term contracts" with facilities, pursuant to which Mediq would endeavor to supply all of those facilities' medical equipment needs. The expert, Darlene Vasconcellos, testified that a small specialized company like SizeWise would be unwilling to enter into a relationship with a national distributor like Mediq without a non-competition clause "because essentially the larger company after gaining this expertise and knowledge specific to bariatrics could then take that knowledge and when the contract was over, they would be in a position to go in and convert all the business over to themselves, thereby cutting out the smaller distribution or the smaller manufacturer." Id. at 206-07. [4] Following the hearing, the district court granted SizeWise's motion for a preliminary injunction. It then specifically ordered as follows:

> [F]rom the date of the Order until either the merits of this case are decided in the pending arbitration or November 1, 2000, whichever comes first, [Mediq] and any party or parties in privity or acting in concert with [Mediq] are enjoined from leasing any hospital beds,

---

[4]Mediq argues that the district court struck as speculative Ms. Vasconcellos's entire testimony relating to irreparable harm. While the court sustained Mediq's objections to several of Ms. Vasconcellos's answers, Mediq did not object to the testimony quoted above.

mattresses, support services, commodes, walkers, wheelchairs, lifts or transfer systems to any hospital or facility identified in Exhibit A . . . if such products are specifically designed to be used by patients whose weight exceeds 350 pounds.

SizeWise Rentals, 87 F. Supp. 2d at 1200-01. This appeal followed.

## DISCUSSION

### A. Merits of Preliminary Injunction

A party seeking a preliminary injunction must show that four conditions are met:

(1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest.

ACLU v. Johnson, 194 F.3d 1149, 1155 (10th Cir. 1999) (quoting Kiowa Indian Tribe of Oklahoma v. Hoover, 150 F.3d 1163, 1171 (10th Cir. 1998)). "We review the grant of a preliminary injunction for an abuse of discretion." Id. We reverse the grant of injunctive relief "'only if the district court abuses its discretion, commits an error of law, or is clearly erroneous in its preliminary factual findings.'" Id. (quoting Kansas Health Care Assoc., Inc. v. Kansas Dep't of Social & Rehabilitation Servs., 31 F.3d 1536, 1543 (10th Cir. 1994) (further quotations omitted)).

We have adopted a "modified requirement as to the likelihood of success." Federal Lands Legal Consortium v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999). If the movant establishes the other three requirements for the issuance of a preliminary injunction, "the movant may satisfy [the] requirement . . . [of likelihood of success on the merits] by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Id. at 1195. Although we apply federal standards concerning the requirements for a preliminary injunction, see Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990), Kansas law may be relevant to particular issues. See Baker's Aid v. Hussman Foodservice Co., 830 F.2d 13, 15 (2d Cir. 1987). The district court found that SizeWise met all four conditions for the issuance of an injunction.

**1. Irreparable Harm**

Mediq argues SizeWise has failed to show irreparable harm because any harm SizeWise suffered is compensable in damages inasmuch as the restrictive covenant at issue applies to a discrete and identifiable group of former customers. It also argues that SizeWise delayed four months in seeking injunctive relief, thereby undermining its claim that it is in imminent danger of irreparable harm. Finally, Mediq argues the district court clearly erred in finding that Mediq had

- 10 -

long-term relationships with "many of the facilities to which it rented [SizeWise's] bariatric equipment," and that "these relationships will seriously impede, if not bar, [SizeWise's] attempts to rent bariatric equipment to those facilities." SizeWise Rentals, 87 F. Supp. 2d at 1198.

"Where there is a full, complete, and adequate remedy at law through recovery of calculable money damages, the injury is not irreparable and equity will not apply the extraordinary remedy of injunction." Wichita Wire, Inc. v. Lenox, 726 P.2d 287, 292 (Kan. Ct. App. 1986). Damages are calculable if they result from the "loss of identifiable customers, who had generated a known dollar amount of business." Id. On the other hand, there is an "inherent difficulty in quantifying the loss of [plaintiff's] competitive advantage in the marketplace, and the damages resulting from loss of customers and good will." Heatron, Inc. v. Shackelford, 898 F. Supp. 1491, 1502 (D. Kan. 1995).

The district court found that SizeWise:

received referrals from facilities being served pursuant to the Agreement, that referrals are an important source of its business, and that facilities being served pursuant to the Agreement were aware that they were using [SizeWise's] equipment. In addition, the Agreement specifies several interests of plaintiff, such as trade names, trademarks, trade secrets and proprietary and confidential information, that [SizeWise] specifically sought to protect with Section 8(b)(ii).

SizeWise Rentals, 87 F. Supp. 2d at 1197-98. The record supports those findings. [5] Moreover, section 8(b)(ii) prohibits Mediq from interfering even "indirectly" with any "present or future" customer of SizeWise. The district court did not abuse its discretion in concluding that SizeWise's "interests in good will, brand recognition, customer contacts, and referral sources cannot be measured in numerical or monetary terms." SizeWise Rentals, 87 F. Supp. 2d at 1200.

With respect to Mediq's delay argument, "[w]hile delay can undermine a claim of irreparable harm," we decline to so hold in this case. See Kansas Health Care Assoc., Inc. v. Kansas Dep't of Soc. & Rehabilitation Servs., 31 F.3d 1536, 1543 (10th Cir. 1994). First, Mediq does not appear to have made this argument before the district court. Additionally, SizeWise asserts that, while it was aware that Mediq was violating various provisions of the Agreement when it filed its

---

[5]Trever Frickey testified that, if Mediq is allowed to continue to violate section 8(b), "I already know we have customers we will currently lose, and I don't think there's any way we'll be able to regain those customers or the referrals that we would have the opportunity to get." Tr. of Hr'g at 71, J.A. at 182. He further explained, "[m]ost of the time you develop relationships with these people, and, I mean, it's like any relationship, there are relationships that go for a long period of time and you move forward and grow with those and prosper. If you lose one of those relationships, it can be extremely detrimental because you don't know what kind of decision maker they are in that marketplace. They could be at a teaching institution and educating people on what is the appropriate bariatric products." J.A. at 183. When asked if he was aware of any injury to SizeWise's reputation because of Mediq's violation of the non-competition covenant, Mr. Frickey responded, "[t]he only instance I'm aware of is the one in southern California where a nurse had called in and asked if we were out of business." Id. at 184.

complaint in this case, it was not aware that it was specifically violating section 8(b)(ii) until shortly after the term of the Agreement expired, and it sought injunctive relief shortly thereafter. We conclude that any claimed delay is not fatal to SizeWise's assertion of irreparable harm.

Finally, Mediq argues that "to the extent that the court's decision with respect to irreparable harm and balancing of hardships were based on its holding that Mediq had long-term contracts with former SizeWise customers which would bar SizeWise from renting to those customers, its decision is based on clear factual error." Appellant's Br. at 29. Mediq misapprehends the district court's finding. The district court held that "[i]n the medical supply business . . . distributors often establish long-term relationships with hospitals and health care facilities in which the distributor serves as the primary vendor for all of a customer's medical equipment needs." SizeWise Rentals, 87 F. Supp. 2d at 1198. The record supports that finding. Indeed, Mediq has conceded that it endeavors to establish such long-term relationships to serve all the needs of health care facilities as those needs arise. The court did not find that these "relationships" were actual contractual relationships. Thus, Mediq's assertion that there are no long-term contracts between Mediq and health care facilities is irrelevant.

**2. Likelihood of Success on the Merits**

- 13 -

Mediq makes several arguments why the district court erred in concluding SizeWise had demonstrated a likelihood of success on the merits of its claim that Mediq was violating section 8(b). It argues: (1) section 8(b)(ii) is an illegal restraint on trade because it serves no legitimate business interest of SizeWise; (2) SizeWise has not established that Mediq is in fact violating section 8(b)(ii); and (3) the court's injunctive order is "overbroad and deprives Mediq of rights secured in the Agreement." Appellant's Br. at 36.

Mediq asserts section 8(b)(ii) is illegal and unenforceable because it does not protect any legitimate business interest of SizeWise. "Under Kansas law, a noncompetition agreement is valid and enforceable where three conditions are met." Heatron, 898 F. Supp. at 1499. "First, the agreement must be a valid and enforceable contract under general principles of contract law." Id. Second, "the employer must have a legitimate proprietary interest to protect." Id. at 1500. Third, "the agreement must be reasonable, based upon the particular facts of the case." Id.; see also Weber v. Tillman, 913 P.2d 84, 88-96 (Kan. 1996); Eastern Distrib. Co., Inc. v. Flynn, 567 P.2d 1371, 1376 (Kan. 1977). Mediq argues that section 8(b) protects no legitimate proprietary interest of SizeWise because all the customer contacts made under the Agreement were developed and maintained by Mediq, and SizeWise identifies no other legitimate proprietary interest such as

"proprietary information, training, or marketing techniques." Appellant's Br. at

33.

The district court upheld the validity of the restrictive covenant. It found:

[SizeWise] produced brochures and "roll-out" materials explaining its products, had a small team of managers that assisted defendant with distribution, and maintained a toll-free number for the benefit of the facilities using its products. Common sense dictates, and the court concludes, that the facilities to which [Mediq] rented [SizeWise's] bariatric equipment are customers of both [SizeWise] and [Mediq].

SizeWise Rentals, 87 F. Supp. 2d at 1199. As indicated above, the record supports those findings. It is "a well-recognized principle that 'customer contacts' is a legitimate interest to be protected." Eastern Distrib., 567 P.2d at 1376. While Mediq may have had a preexisting relationship with most of the customers who rented SizeWise equipment under the Agreement, the record supports the district court's conclusion that SizeWise also contributed to the development and maintenance of those customer contacts as they facilitated the placement of SizeWise equipment in those customers' facilities. The record further supports the district court's conclusion that the covenant "seeks to protect [SizeWise's] legitimate interests in customer contacts, good will, brand recognition, and referral sources." SizeWise Rentals, 87 F. Supp. 2d at 1200. The fact that Mediq actually billed the customers does not completely trump other

evidence showing that, in reality, the customers belonged to both Mediq and SizeWise.

Mediq also argues the court erred in holding that Mediq was breaching or likely to breach section 8(b)(ii) by offering to rent bariatric products to any customer to whom it had previously rented SizeWise products.  It argues that section 8(b)(ii) only prohibits it from "directly or indirectly request[ing] or advis[ing]" SizeWise's present or future customers to "withdraw, curtail, alter or cancel their business" with SizeWise.  J.A. at 41.  We agree with the district court's rejection of this argument:

> If [Mediq] sells bariatric equipment to the[] facilities [to which it had leased such equipment during the Agreement], it will violate the Agreement by indirectly—if not directly—requesting that the facilities not do business with [SizeWise], especially because [Mediq] endeavors to establish or maintain long-term "one-stop shop" relationships with them.  That type of relationship, by its very nature, anticipates that the facilities do business only with [Mediq], and not with [SizeWise].

SizeWise Rentals, 87 F. Supp. 2d at 1199.

Finally, Mediq argues that the court's injunction is overbroad and deprives Mediq of its rights under section 8(c) of the Agreement, which provides that section 8(b) does not apply where a customer insists on renting non-SizeWise equipment, so long as Mediq endeavors to convince such a customer to rent SizeWise equipment before renting non-SizeWise equipment to it.  Mediq did not

argue the effect of section 8(c) to the district court. [6] The record contains no evidence relevant to such a determination. We conclude that the district court did not abuse its discretion in granting the preliminary injunction without reference to section 8(c).

The district court did not abuse its discretion in concluding that SizeWise demonstrated a likelihood that it ultimately will prevail on the merits. [7]

### 3. Balance of Harms and Public Interest

Mediq argues the district court erred in holding that the balance of harms and the public interest support the grant of the preliminary injunction in this case. We affirm the district court's conclusion that the proper resolution of those two issues supports the issuance of the preliminary injunction. We do so for substantially the reasons set forth in the district court's opinion.

---

[6]Apparently no one argued this issue to the district court, even when the district court raised the issue with the parties. See Tr. of Hr'g at 137, J.A. at 248 (The court observed that "[a]nother provision that really nobody has discussed much would be Subparagraph (c) of Paragraph 8.").

[7]Since, as we discuss infra, in addition to meeting the irreparable harm requirement, SizeWise also prevails on the balancing of harms and public interest requirements for preliminary injunctive relief, SizeWise need only show "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation" to establish a likelihood that it will prevail on the merits. Federal Lands Legal Consortium, 195 F.3d at 1195.

In sum, we hold that the district court did not abuse its discretion in granting SizeWise's motion for a preliminary injunction.

## B.  Rule 65(c) Security

Fed. R. Civ. P. 65(c) provides as follows:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

In this case, the district court issued a brief Order Nunc Pro Tunc addressing the necessity of a Rule 65(c) bond:

> The court, in its memorandum and order granting plaintiff's motion for preliminary injunction, failed to state whether a bond shall be required in accordance with Fed. R. Civ. P. 65(c).  The court determines that no bond shall be required.

J.A. at 571 (citations omitted).  Mediq argues the district court violated Rule 65(c) by entering the preliminary injunction without requiring SizeWise to post a bond.

"[W]e have held that a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'"  Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987) (quoting Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782 (10th Cir. 1964)).

While we have observed that "[a] trial court decision to waive a Rule 65(c) bond is subject to an abuse of discretion test on appeal[,] . . . [t]hat test cannot be employed in the absence of specific findings." Id.

In this case, while the district court considered the bond requirement issue, it failed to explain why it concluded that no such bond is necessary. We can only infer that the court determined there was "an absence of proof showing a likelihood of harm." Id. While normally such an omission would necessitate a remand on that specific issue, we decline to do so in this case, given the particular circumstances present here. The preliminary injunction will be dissolved on November 1, 2000, or when arbitration of the dispute between the parties is concluded, whichever occurs first. Were we to remand this issue, by the time the district court ruled on it, and any appeal was resolved, the matter would very likely have become moot by the passage of time.

## CONCLUSION

For the foregoing reasons, we AFFIRM the order of the district court.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge