**SPRINT CORPORATION, Plaintiff,**

v.

**Dominick DEANGELO, Defendant.**

**No. CIV. A. 98–2237–KHV.**

United States District Court,
D. Kansas.

June 30, 1998.

Jeffrey M. Place, Spencer, Fane, Britt & Browne, Kansas City, MO, for Plaintiff.

James D. Griffin, Stephen J. Torline, Blackwell Sanders Peper Martin LLP, Overland Park, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Sprint Corporation brings suit against its former employee, Dominick DeAngelo, claiming that he breached a contract of employment which contained a confidentiality agreement and covenant not to compete. On May 29, 1998, Sprint filed its complaint, seeking to prohibit defendant from working for IXC Corporation pending a final decision in this case. The Court held a hearing on June 9, 1998, and took the matter under advisement. After fully considering the parties' briefs, oral arguments, testimony at the hearing, and exhibits, the Court on June 20, 1998 advised the parties that it intended to deny Sprint's application for preliminary injunctive relief. For reasons stated more fully below, that application is hereby overruled.

### Preliminary Injunction Standard

The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case." *Tri–State Generation and Transmission Ass'n. Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986). A preliminary injunction is a drastic and extraordinary remedy, and courts do not grant it as a matter of right. *Paul's Beauty College v. United States,* 885 F.Supp. 1468, 1471 (D.Kan.1995); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948, at 128–29 & nn. 3, 6–7 (1995). We must deny injunctive relief if the moving party fails to establish any requisite element, *Packerware Corp. v. Corning Consumer Products Co.,* 895 F.Supp. 1438, 1446 (D.Kan.1995), and the moving party must establish that it is entitled to injunctive relief by clear and unequivocal proof. *Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181, 1185 (10th Cir.1975); *Paul's,* 885 F.Supp. at 1471.

In order to obtain a preliminary injunction, movant must establish that (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, will not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *Tri–State,* 805 F.2d at 355 (citing *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980)); *Heatron, Inc. v. Shackelford,* 898 F.Supp. 1491, 1498 (D.Kan. 1995). Courts disfavor certain types of preliminary injunctions, including ones that afford the movant substantially all the relief it may recover at the conclusion of a full trial on the merits. *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098–1099 (10th Cir. 1991); *Paul's,* 885 F.Supp. at 1471. When a movant seeks this type of preliminary injunction, courts require the movant to satisfy the even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction may issue. *Visa,* 936 F.2d at 1098–1099; *Paul's,* 885 F.Supp. at 1472.

## Factual Summary

### A. Background

Sprint, a Kansas corporation with its principal place of business in Kansas, is a common carrier which sells telecommunications services. It also sells Internet access and support systems. On December 12, 1995, defendant entered into an employment contract with Sprint. The contract, entitled "Agreement Regarding Special Compensation and Post Employment Restrictive Covenants," specified certain terms and conditions of defendant's employment. The agreement contained the following confidentiality provision:

> Executive acknowledges that during the course of his employment he has learned or will learn to develop Confidential Information .... [and] that unauthorized disclosure or use of such Confidential Information, other than in discharge of Executive's duties, will cause employer irreparable harm.
>
> \* \* \* \* \* \*
>
> Except in the course of his employment and in the pursuit of the business of Employer ... Executive shall not, during the course of his employment, or for a period of eighteen (18) months following termination of his employment, for any reason, directly or indirectly, disclose, publish, communicate or use on his behalf or another's behalf, any proprietary information or data of Employer ....

The agreement also contained the following non-compete provision:

> Executive acknowledges that use or disclosure of Confidential Information ... is likely if Executive were to perform *telecommunications functions related to long distance services* on behalf of a competitor of Employer. Therefore, Executive shall not, for eighteen (18) months following termination of employment for any reason ... perform any services for any entity ... where Executive dedicates any time or efforts to managing, controlling, participating in ... or otherwise assisting any per-

son or entity in the *long distance business or performing functions relating to long distance services.*

> \* \* \* \* \* \*
>
> This section shall not prevent Executive from using general skills and experience developed during employment with Employer or other employers; or from accepting a position of employment with another company ... which competes with Employer, if its business is diversified and executive is employed in a part of the business that is *not related to long distance services* ....

(emphasis added.)

In consideration for defendant's employment agreement, Sprint gave defendant restricted stock and other valuable consideration. Defendant worked for Sprint as Assistant Vice President for Internet Protocol Services ("IP Services"), and he supervised the development and marketing of Sprint's Internet telecommunications services in the United States. In that regard, he developed strategic information, methods and techniques for providing Internet services, marketing plans, research and development plans, business plans and forecasts, personnel information, pricing and financial information, current and prospective customer lists, and information concerning purchases of major equipment. Sprint has not made this information generally available to the public; it considers such information to be proprietary and confidential information which is extremely valuable to its business.

Defendant resigned his employment with Sprint effective May 15, 1998, to assume a position as Senior Vice President, Data Product Management (Internet Responsibility) for IXC Communications, Inc. ("IXC"). IXC competes with Sprint in the long distance telephone business. Its business, however, is diversified; it offers long distance service and is also developing Internet services.[1] Sprint claims that IXC's emergent Internet

---

1. According to an IXC press release from the first quarter of 1998, "IXC's offerings include private line, broadband, Internet and long distance switched and dedicated services." Furthermore, according to an IXC release entitled "Company Overview," IXC provides "communication solutions" to national and regional long-distance carriers and resellers, Internet service providers, local telephone companies, and cable and utility companies.

services are "related to long distance services" and that the parties' agreement prohibits defendant from accepting a job with IXC, assisting IXC in its long distance business, or performing any IXC functions relating to long distance services. Defendant claims that Internet services are not long distance services and that they do not "relate" to long distance services in any contractually relevant sense of the word. A full understanding of the parties' positions requires an understanding of telecommunications technology—a topic to which we now turn.

## B. The Internet And Internet Services: Brief Overview

The Internet is a network of networks: a large computer network that connects smaller networks of computers.[2] A computer operator gains access to the Internet in one of two ways: through a computer that is part of a network that is directly connected to the Internet, or through a computer that uses a modem to connect to a computer or a network that is directly connected to the Internet. Information which is transferred from one computer to another over the Internet does not follow a set path; rather, electronically coded information are broken into packets which may take the same or different routes to their ultimate destination. When they arrive at the destination, the information packets are reassembled into their original form. This method of data transmission is known as "routing."

At this time, the Internet is layered on top of existing telephone systems, in that to a large extent, data packets travel over fiber optic communication lines which are owned by telephone companies. Such lines carry not only Internet data packets but long distance telephone calls and other data transmissions such as fax communications.[3] Sprint owns fiber optic lines, which are commonly known as "backbones." To gain access to a backbone, long distance telephone calls, Internet data packets and other data transmissions must pass through switches at each end of the backbone. Sprint sells backbone services and leases backbone capacity to retail and businesses customers on local, national and global levels.

Companies which provide access to the Internet are known as Internet service providers or ISPs. IXC is a diversified carrier in the traditional long distance telephone business. Unlike Sprint, it is not in the backbone business. It hopes to get into the backbone business and thus become an ISP, by acquiring Regional Bell Operating Companies which will offer both Internet connectivity and value added Internet services. To that end, IXC has hired defendant and one other individual to develop value added Internet services.

ISPs offer value added Internet services to provide enhanced access and other features such as browsers and dialers for Internet users. A browser is a computer program (such as Netscape Navigator or Microsoft Explorer) that gives the user a graphical interface to the World Wide Web ("Web").[4] A dialer is a computer program that enables the user to connect to another computer or computer network over standard telephone lines by means of a computer modem. Some ISPs also offer security services so that Internet users may safeguard data which is sent or received over the Internet. Certain ISPs also offer "hosting" services. Such services allow customers to store Web sites on the ISP server, thus permitting other Inter-

---

**2.** The Federal Communications Act ("FCA") defines "Internet" as "the international computer network of both Federal and non-Federal interoperable packet switched data networks." 47 U.S.C. § 230(e)(1). For a detailed explanation of the Internet, see *American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 830 (E.D.Pa.1996), *aff'd,* —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

**3.** Packet routing over the Internet differs from long distance telephone routing, in that the latter involves "the transmission, between or among points specified by the user, of information of the

user's choosing, *without change in the form or content of the information as sent and received."* 47 U.S.C. § 153(43) (emphasis added). Fiber optic and other "hard wired" technology is not essential, however, to either long distance voice communication or Internet communication; wireless satellite technology affords an alternative means of communication.

**4.** The Web is a part of the Internet which takes advantage of the Hypertext Markup Language ("HTML") to give users easy access to a vast range of sites which can be linked to one another.

net users to access the Web site via the Internet. ISPs also provide "enablers" such as electronic mail ("e-mail") and electronic commerce ("e-commerce").[5] Finally, ISPs may offer customers a "help desk" from which they can obtain technical assistance. These value added services vary from one ISP to the next, but the differences are not significant. Sprint is an ISP, and while it offers or plans to offer various value added services, none of them are unique to Sprint. Typically, ISPs use off-the-shelf software and other products to provide the value added services which they market to their customers.

The Federal Communications Commission ("FCC") regulates interstate telecommunications common carriers. *See* 47 U.S.C. § 151, *et seq.* Generally, the Internet is not subject to regulation by the federal government. *E.g.*, 47 U.S.C. § 230(b)(2) (policy of United States is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation").

### Analysis

■ Sprint's complaint seeks monetary damages, but its primary objective is to enforce the non-compete agreement to prevent inevitable use and disclosure of proprietary information which defendant developed or discovered while at Sprint. Sprint's damage claim is difficult to quantify, partly because of inherent problems which are involved in measuring the loss of a competitive advantage, and partly because defendant is so new in his position at IXC that he has scarcely had time to orient himself to the business of his new employer—let alone employ confidential information to Sprint's detriment. Sprint concedes that it will be unable to prove a viable claim for contract damages,[6] and that injunctive relief will afford Sprint substantially all of the relief it might recover at a trial on the merits. Accordingly, for a

preliminary injunction to issue, Sprint must satisfy a heavier burden. *Visa*, 936 F.2d at 1098–1099. Sprint has not met that burden.

### A. Likelihood Of Success On The Merits

To obtain a preliminary injunction, Sprint must establish a substantial likelihood that it will eventually prevail on the merits. *Tri-State*, 805 F.2d at 355. Defendant does not claim that the agreement is invalid or unenforceable; his disagreement concerns the intended effect of the agreement. As a result, in determining whether Sprint has demonstrated a substantial likelihood that it will eventually prevail on the merits, the issue is whether defendant's work at IXC involves the long distance business or is "related" to long distance services, as prohibited by the non-compete agreement.

Both parties contend that the non-compete agreement is narrow in scope, and they agree that it allows defendant to work for any business that is not in the long distance business, and even to work for a diversified long distance provider, so long as defendant is employed in a part of the business that does not "relate" to long distance services. As in many cases, however, the devil is in the details. Here, the dispute lies in the definition of "long distance services" and what activities "relate" to long distance services under the agreement. Sprint argues that value added Internet services clearly "relate" to long distance services and that it therefore has a substantial likelihood of success on the merits. Defendant argues that the value added Internet services business is not the long distance business and is not even "related" to long distance services. Defendant argues that the Court should construe the agreement against Sprint and that Internet services and long distance services are distinct because of differences in their purposes, regulations, pricing structures and customer segments. Defendant also contends that he

---

5. E-mail enables an Internet user to send electronic messages directly to another user's e-mail address. E-commerce encompasses services which allow businesses to sell products to customers via the Internet through the use of virtual shopping baskets, order forms, and so forth.

6. *See Memorandum Supporting Entry Of Preliminary Injunction* (Doc. # 4) filed June 8, 1998, p. 7–8 ("[I]f an injunction does not issue, plaintiff will be placed in the impossible position of demonstrating the extent to which this confidential information in defendant's possession has been used for the benefit of IXC Communications, and quantifying the damages resulting therefrom.")

relied on the apparently narrow scope of the agreement when he chose to sign it, and that he did not think that Internet service included long distance-related service.

■ Under Kansas law, covenants not to compete which are contained in employment contracts are strictly construed against employers. *E.g., Weber v. Tillman,* 259 Kan. 457, 462, 913 P.2d 84, 89 (1996). Honoring this requirement, we are bound to construe the agreement strictly against Sprint. Doing so, the Court finds that Sprint has failed to establish a substantial likelihood of success on the merits.

■ Under fundamental principles of contract construction, the Court should interpret the contract so as to give effect to the mutual intentions of the parties at the time they entered into the contract. *Weber,* 259 Kan. at 476, 913 P.2d at 96–97; *Tomkins Indus., Inc., Ruskin Mfg. Div. v. Sheet Metal Workers' Int'l Assoc., Local No. 2,* 903 F.Supp. 1438, 1442 (D.Kan.1995). The problem in construing Sprint's non-compete agreement lies in the parties' failure to define what business "related" to "long distance services" at the time they entered into their agreement. The issue is problematical because, in view of the explosion of technology, the Internet landscape is entirely different now than it was three years ago, when defendant signed the non-compete agreement. Its relationship to "long distance services" is therefore necessarily different than it was three years ago. Moreover, three years from now, as wireless technology assumes an increasingly prominent role in telecommunications, a reference to "long distance services" may mean something altogether different. The issue is also problematical because both parties address substantially all of their evidence to the current relationship between the value added Internet services industry and "long distance services," and give very little consideration to how the parties perceived that relationship when they entered into that agreement in 1995.

The parties have widely differing views on what job functions "relate" to "long distance services" at this time. Sprint argues that value added Internet services are "related" to "long distance services" because (1) data packets travel the Internet on fiber optic lines owned by long distance telephone companies; (2) data packets travel long distances over the Internet; and (3) Sprint customers think that long distance service is related to Internet service. From the evidence introduced at the hearing, however, the Court is not persuaded that the parties intended that defendant's obligations under the non-compete agreement would be defined by such a simplistic and customer-informed (or customer-uninformed) view of the long distance market. "Long distance" is a term that has a common meaning within the telecommunications industry, in that it denotes "[a]ny telephone call to a location outside the local service area." Newton's TeleCom Dictionary 367 (14th ed.1998). Historically, the term has carried regulatory weight which defies simple explanation by facile reference to the fact that a telephone communication may be received some way off from where it started. Therefore the fact that data packets may travel long distances over the Internet does not inform our interpretation of the contract in this case.

Similarly, Sprint has not shown that it is substantially likely to prevail on its argument that the parties intended their obligations under the non-compete agreement to be defined by the market expectations of Sprint customers. According to Patti Manuel, President of Sprint's Long Distance Division, it is impossible to separate long distance service from Internet protocol services in the minds of Sprint customers. She also testified, however, that Sprint customers view long distance services and Internet value added services separately. Whatever the fact of this matter may be, and regardless whether Sprint customers have an informed understanding of the relationship between long distance and Internet services, the record contains no evidence that the parties intended their obligations under the non-compete agreement to be governed by customer expectations.

Finally, the fact that data packets travel the Internet on fiber optic lines owned by long distance telephone companies does not convince the Court that the non-compete agreement prohibits defendant from developing value added Internet services for IXC.

As noted above, the Internet presently is a network of computer networks that for transit purposes is layered on top of lines that are provided by long distance telephone companies. Long distance voice communications and Internet communications therefore travel the same highways. To that extent they are "related" in the same way that all travelers on all federal highways are related. This is not to say that they are "related" in any sense that is relevant to the parties' agreement. Sprint's interpretation of what is "related" to long distance services would encompass any activity remotely connected to interstate telecommunications. For example, it would prohibit defendant from taking telephone orders at Lands' End or selling concert tickets for TicketMaster.

 The standards which govern the issuance of a preliminary injunction require Sprint to establish that it is entitled to injunctive relief by clear and unequivocal proof. *Penn,* 528 F.2d at 1185. This is a high burden, especially since we must strictly construe against Sprint defendant's covenant not to compete. *Weber,* 259 Kan. 457 at 462, 913 P.2d at 89. Sprint's proposed broad reading of what is "related to long distance" does not comport with these standards. As applied to the facts of this case, the contract language is either ambiguous or so vague and indefinite that it cannot be enforced under Kansas law. Whether a contract's terms are ambiguous is a question of law decided by the Court. *United States v. Mintz,* 935 F.Supp. 1178, 1179 (D.Kan.1996). If the Court finds the terms to be ambiguous, the Court may examine extrinsic evidence, including the circumstances existing prior to and contemporaneously with the contract's execution, to interpret its meaning. *Amoco Prod. Co. v. Kansas Power & Light Co.,* 505 F.Supp. 628, 632 (D.Kan.1980)(citing *Amortibanc Investment Co. v. Jehan,* 220 Kan. 33, 43, 551 P.2d 918, 925 (1976)). On the other hand, where a contract is so vague and indefinite that the intentions of the parties cannot be ascertained, it is unenforceable under Kansas law. *Mohr v. State Bank of Stanley,* 244 Kan. 555, 573, 770 P.2d 466, 480 (1989)(citing *Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 971, 457 P.2d 691, 695 (1969)); *Sithon Maritime Co. v. Holiday Mansion,* 177 F.R.D. 504, 506 (D.Kan.1998).

The record before the Court is insufficient to resolve the contract's ambiguity or to permit the Court to say with confidence that Sprint is substantially likely to prevail on its interpretation of the ambiguous language. Therefore at this stage the Court must entertain the equally likely prospect that the contract may be found to be too vague and indefinite to be capable of enforcement.

In short, on this record the Court cannot ascertain what field of employment is denied defendant under the non-compete agreement. While Sprint may ultimately carry the day on this issue and establish that the parties intended to prevent defendant from assuming the employment obligations that are at issue in this case, it has not done so on this record. For now, Sprint has failed to establish a substantial likelihood of success on the merits.

## B. Irreparable Injury

Sprint argues that this case presents a textbook example of irreparable harm. According to Sprint, defendant necessarily will use his knowledge of Sprint's Internet service strategies in the performance of his duties for IXC, and his use of this information will deprive Sprint of a competitive advantage which it developed through substantial expenditures of time and money.

 A threat to trade or business viability may constitute irreparable harm. *See, e.g., John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 28–29 (2d Cir.1978)(possibility of going out of business is irreparable harm), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970)(loss of right to continue business may support claim of irreparable injury). To constitute irreparable harm, however, an injury cannot be speculative; "it must be certain, great, and actual." *Chemical Weapons Working Group, Inc. v. United States Dep't of the Army,* 963 F.Supp. 1083, 1095 (D.Utah 1997). The injury complained of must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. *Id.* See also *Tri-State,* 805 F.2d at 356 (threat to trade or business viability may constitute

irreparable harm); *Regan v. Vinick & Young,* 862 F.2d 896, 902 (1st Cir.1988)(speculation or unsubstantiated fears about what may happen in future cannot provide basis for preliminary injunction).

Even assuming that defendant breached the non-compete agreement, Sprint's claim of irreparable injury has not been proven by clear and unequivocal proof. Sprint contends that defendant's work for IXC gives it an unfair competitive advantage. Sprint's claim is that "speed to market" is a critical competition issue in the Internet industry and that defendant's knowledge will expedite IXC's development of Internet services.

At this time, neither Sprint nor IXC has value added Internet services for sale to retail customers. Therefore Sprint and IXC are not competitors so much as potential future competitors in that market. In theory, defendant might use confidential information from Sprint and thereby position IXC to win the race to market its value added Internet services. On this record, however, such fears are speculative. Sprint and IXC are both late entries in this market and from the record it is not clear that either one of them is sufficiently advanced in its marketing efforts to exploit confidential marketing information from the other. From the evidence produced at the hearing, the Court cannot conclude that the confidential information in defendant's possession will afford IXC any material advantage in the retail market, in terms of "speed to market" or otherwise.

Sprint does market value-added Internet services to business customers, but it operates that business at a loss. Again, Sprint and IXC do not yet appear to directly compete in any respect which is relevant to defendant's experience and confidential information, and any irreparable injury that could potentially arise from defendant's work for IXC would appear to be speculative at best. The fact that IXC might benefit from defendant's knowledge does not prove clearly and unequivocally that Sprint will thereby suffer irreparable injury from defendant's breach of the agreement.

In summary, Sprint has not clearly and unequivocally demonstrated that it will suffer irreparable injury as a result of defendant's employment with IXC.

## C. Balancing Of Harms

Sprint's sole argument regarding the harm it will suffer without a preliminary injunction is that defendant—by signing the non-compete agreement—has acknowledged that Sprint will suffer irreparable injury if he works for IXC.[7] Sprint acknowledges that defendant will suffer harm if the Court enjoins him from working for IXC. It essentially claims that such harm, unlike its harm, is not irreparable; Sprint can post security to protect defendant's legitimate financial interests should defendant prevail at trial; and the restrictions on defendant's employment will remain in effect for only 18 months.

If the nature of defendant's work were different, we might agree that an 18–month restriction and security bond would adjust the equitable balance between the relative harms to Sprint and defendant. As Sprint has noted however, speed is critical in the rapidly evolving Internet services industry; enormous changes can occur during extremely short periods; and exclusion from the industry could destroy defendant's future in that industry. Were the injunction to issue, the potential harm to defendant would greatly exceed any proven harm to Sprint. Accordingly, the balance of harms weighs more heavily against defendant if an injunction should issue.

## D. Public Interest

Sprint argues that the enforcement of a valid contract is in the public interest, as is the restraint of unfair competition. *See Heatron,* 898 F.Supp. at 1502. Sprint cites Kansas case law which holds that courts have a

---

7. Apparently Sprint is referring to the language in the agreement which provides that, "Executive acknowledges that ... unauthorized disclosure or use of such Confidential Information ... will cause Employer irreparable harm." Sprint has not proven unauthorized disclosure, however, nor has defendant confessed it. As to future disclosure, defendant acknowledges only that use or disclosure of confidential information is "likely" if defendant is to perform telecommunications functions related to long distance services on behalf of a competitor. In this case, however, defendant contends that Sprint information has no relevance to his job responsibilities at IXC.

duty to sustain contracts when they are fairly entered into, rather than to seek technical grounds for defeating their intended purpose, and that as a matter of public policy, courts should not lightly interfere with freedom of contract. *Weber*, 259 Kan. at 474, 913 P.2d at 96.

Defendant argues that Sprint could have asked defendant to sign a modified non-compete agreement to include Internet related activities, and that it would not be in the public interest to expand defendant's non-competition agreement beyond its express terms. We agree. Sprint drafted this agreement and it could have more clearly articulated any intent to prohibit defendant from securing employment in the value added Internet services market. While the Court should not lightly interfere with the parties' freedom of contract, by the same token it should not through the drastic remedy of a preliminary injunction enforce terms which are not clearly shown to have been agreed. Accordingly, the Court finds that it would not be in the public interest to enforce the agreement in a manner consistent with Sprint's broad reading of the language therein.

**IT IS THEREFORE ORDERED** that plaintiff's motion for injunctive relief, filed May 29, 1998, be and hereby is **OVERRULED.**